IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMEGY BANK NATIONAL ASSOCIATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO._____ |
| | § | |
| MONARCH FLIGHT II, LLC, | § | |
| WILLIAM B. JOHNSON, | § | |
| JOHN T. BOBO, | § | |
| BOBO, HUNT, WHITE & NANCE, | § | |
| AN ASSOCIATION OF ATTORNEYS, | § | |
| HOST HOTELS & RESORTS, L.P., AND | § | |
| HOST HOTELS & RESORTS, INC. | § | |
| | § | |
| Defendants. | § | |

# AMEGY'S ORIGINAL COMPLAINT AND VERIFIED
# APPLICATION FOR INJUNCTIVE RELIEF

Geoffrey H. Bracken
State Bar No. 02809750
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007
Telephone:  713.276.5500
Facsimile:   713.276.5555

ATTORNEY-IN-CHARGE FOR PLAINTIFF,
AMEGY BANK NATIONAL ASSOCIATION

OF COUNSEL:
Peter Scaff
State Bar No. 24027837
Rhonda Weiner
State Bar No. 24047732
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007
Telephone:  713.276.5500
Facsimile:  713.276.5555

<u>PARTIES</u>

1.      Plaintiff, Amegy Bank National Association ("Amegy"), is a national banking association licensed to and doing business in the State of Texas.  The Amegy branch office which negotiated and funded the Promissory Note in dispute is located in Houston, Texas.

2.      Upon information and belief, Defendant, Monarch Flight II, LLC, is a Delaware limited liability company.  Plaintiff, Amegy Bank National Association's causes of action against Monarch Flight II, LLC arise out of business done in Texas and to which this defendant is a party, as more specifically described in this complaint, but Monarch Flight II, LLC does not maintain a regular place of business in Texas or a registered agent in Texas on whom process can be served.  Accordingly, pursuant to Texas Civil Practice and Remedies Code §§ 17.044(b) and 17.045 and sections 5.251 through 5.253 of the Texas Business Organizations Code, service on Monarch Flight II, LLC may be made by serving duplicate copies of process on the Secretary of State of Texas, Citations Unit, James E. Rudder Building, 1019 Brazos, Room 220, Austin, Texas 78701, who shall immediately mail a copy to Monarch Flight II, LLC's principal office by U.S. certified mail, return receipt requested as follows: Monarch Flight II, LLC, 100 West Paces Ferry Road, Atlanta, Georgia 30305.

3.      Upon information and belief, Defendant, William B. Johnson is an individual residing in Atlanta, Georgia.  William B. Johnson contracted with Amegy Bank National Association, a Texas resident, and the contract is performable in Texas.  This lawsuit arises from William B. Johnson's contract and conduct with Amegy Bank National Association.  William B. Johnson does not maintain a regular place of business in Texas or a designated agent for service of process in Texas on whom process can be served.  Accordingly, pursuant to Texas Civil Practice and Remedies Code §§ 17.044(b) and 17.045(a), service on William B. Johnson may be made by serving duplicate copies of process on the Secretary of State of Texas, Citations Unit,

James E. Rudder Building, 1019 Brazos, Room 220, Austin, Texas 78701, who shall immediately mail a copy of the process to William B. Johnson at his home by U.S. certified mail, return receipt requested, as follows: William B. Johnson, 3000 Andrew Dr. NW, Atlanta, Georgia 30305. Additionally, William B. Johnson may be served by serving process on him at any location where he may be found.

4.     Upon information and belief, Defendant John T. Bobo is an individual residing in or about Shelbyville, Tennessee. Plaintiff, Amegy Bank National Association's causes of action against John T. Bobo arise out of acts that John T. Bobo has done that constitute doing business in Texas as more specifically described in this complaint, but John T. Bobo does not maintain a regular place of business in Texas or a registered agent on whom process can be served. Accordingly, pursuant to Texas Civil Practice and Remedies Code §§ 17.044(b) and 17.045(a), service on John T. Bobo may be made by serving duplicate copies of process on the Secretary of State of Texas, Citations Unit, James E. Rudder Building, 1019 Brazos, Room 220, Austin, Texas 78701, who shall immediately mail a copy of the process to John T. Bobo at his home office by U.S. certified mail, return receipt requested, as follows:  John T. Bobo, Bobo, Hunt, White & Nance, Regions Bank Building, Suite 202, P.O. Box 169, Shelbyville, Tennessee 37162-0169.  Additionally, John T. Bobo may be served by serving process on him at any location where he may be found.

5.     Upon information and belief, Defendant, Bobo, Hunt, White & Nance, an Association of Attorneys, is a Tennessee partnership.  Plaintiff, Amegy Bank National Association's causes of action against Bobo, Hunt, White & Nance, an Association of Attorneys arise out of acts that Bobo, Hunt, White & Nance, an Association of Attorneys has done that constitute doing business in Texas as more specifically described in this complaint, but Bobo,

Hunt, White & Nance, an Association of Attorneys does not maintain a regular place of business in Texas or a registered agent on whom process can be served. Accordingly, pursuant to Texas Civil Practice and Remedies Code §§ 17.044(b) and 17.045 and sections 5.251 through 5.253 of the Texas Business Organizations Code, service on Bobo, Hunt, White & Nance, an Association of Attorneys may be made by serving duplicate copies of process on the Secretary of State of Texas, Citations Unit, James E. Rudder Building, 1019 Brazos, Room 220, Austin, Texas 78701, who shall immediately mail a copy of the process to Bobo, Hunt, White & Nance, an Association of Attorneys' principal office by U.S. certified mail, return receipt requested, as follows: Bobo, Hunt, White & Nance, An Association of Attorneys, Regions Bank Bldg, Suite 202, P.O. Box 169, Shelbyville, Tennessee 37162-0169.

6.     Upon information and belief, Defendant, Host Hotels & Resorts, L.P., is a Delaware limited partnership.  Plaintiff, Amegy Bank National Association's causes of action against Host Hotels & Resorts, L.P. arise out of acts that Host Hotels & Resorts, L.P. has done that constitute doing business in Texas as more specifically described in this complaint, but Host Hotels & Resorts, L.P. does not maintain a regular place of business in Texas or a registered agent on whom process can be served. Accordingly, pursuant to Texas Civil Practice and Remedies Code §§ 17.044(b) and 17.045 and sections 5.251 through 5.253 of the Texas Business Organizations Code, service on Host Hotels & Resorts, L.P. may be made by serving duplicate copies of process on the Secretary of State of Texas, Citations Unit, James E. Rudder Building, 1019 Brazos, Room 220, Austin, Texas 78701, who shall immediately mail a copy of the process to Host Hotels & Resorts, L.P.'s principal office by U.S. certified mail, return receipt requested, as follows: Host Hotels & Resorts, L.P., 6903 Rockledge Drive, Suite 1500, Bethesda, MD 20817.

7.     Upon information and belief, Defendant, Host Hotels & Resorts, Inc., is a Delaware corporation.  Plaintiff, Amegy Bank National Association's causes of action against Host Hotels & Resorts, Inc. arise out of acts that Host Hotels & Resorts, Inc. has done that constitute doing business in Texas as more specifically described in this complaint, but Host Hotels & Resorts, Inc. does not maintain a regular place of business in Texas or a registered agent on whom process can be served. Accordingly, pursuant to Texas Civil Practice and Remedies Code §§ 17.044(b) and 17.045 and sections 5.251 through 5.253 of the Texas Business Organizations Code, service on Host Hotels & Resorts, Inc. may be made by serving duplicate copies of process on the Secretary of State of Texas, Citations Unit, James E. Rudder Building, 1019 Brazos, Room 220, Austin, Texas 78701, who shall immediately mail a copy of the process to Host Hotels & Resorts, Inc.'s principal office by U.S. certified mail, return receipt requested, as follows: Host Hotels & Resorts, Inc., 6903 Rockledge Drive, Suite 1500, Bethesda, MD 20817.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to the United States Constitution art. 3, sec. 2, and 28 U.S.C. §1332(a)(1) because complete diversity of citizenship exists between the Plaintiff and the Defendants, and the amount in controversy is in excess of $75,000.00.

9.     Venue is proper in the Southern District of Texas under 28 U.S.C. §1391(a)(2), as this is the district where a substantial part of the events giving rise to this Complaint occurred.

## EVIDENCE

Exhibit 1:   "Promissory Note" made by borrower, Monarch Flight, to lender, Amegy, for the principal sum of $15,000,000.00;

Exhibit 2:   "Guaranty Agreement" whereby guarantor, Johnson, "irrevocably and unconditionally guarantees" payment of the Promissory Note, dated May 1, 2008;

Exhibit 3:     "Security Agreement" between Johnson and Amegy, pledging all partnership units owned by William B. Johnson in Host Hotels, and all related stock and proceeds as collateral, dated May 1, 2008;

Exhibit 4:     "Aircraft Security Agreement" between Monarch Flight and Amegy, pledging the GIII Jet as collateral, dated May 1, 2008;

Exhibit 5:     "Officer's Certificate" of Monarch Flight authorizing Johnson to execute the Promissory Note and the Aircraft Security Agreement, dated May 1, 2008;

Exhibit 6:     UCC Financing Statement covering the partnership units, and all related stock and proceeds, dated May 7, 2008;

Exhibit 7:     UCC Financing Statement covering the GIII Jet, dated May 6, 2008;

Exhibit 8:     Bobo's letter confirming Johnson's ownership of 825,457 units in Host Hotels worth $9,666,101.44, dated December 31, 2009;

Exhibit 9:     Johnson's "Notice of Redemption" of partnership units in Host Hotels, dated January 5, 2010;

Exhibit 10:    April 29, 2008 email from Bobo to Amegy regarding collateral;

Exhibit 11:    April 30, 2008 email from Amegy to Bobo regarding obtaining control agreement from Host Hotels;

Exhibit 12:    November 9, 2009 letter from Bobo to Amegy regarding information requested from Amegy;

Exhibit 13:    December 10, 2009 letter from Amegy to Monarch Flight and Bobo demanding a loan paydown;

Exhibit 14:    January 12, 2010 email from Bobo to Amegy regarding delinquent January payment;

Exhibit 15:    March 4, 2010 letter from Amegy to Monarch Flight and Bobo regarding notice of acceleration;

Exhibit 16:    April 13, 2010 letter from Thompson to Amegy regarding collateral securing the Promissory Note, and proposal to modify the existing loan documentation;

Exhibit 17:    April 23, 2010 letter from Amegy to Thompson regarding proposal to modify the existing loan documentation;

Exhibit 18:    May 11, 2010 letter from Amegy to Monarch Flight and Thompson regarding proposal to modify the existing loan documentation and paydown of the Promissory Note;

Exhibit 19:    May 21, 2010 letter from Thompson to Amegy regarding modification to and paydown of the Promissory Note;

Exhibit 20:    September 23, 2010 letter from Amegy to Monarch Flight and Thompson regarding access to GIII Jet;

| | |
|---|---|
| Exhibit 21: | October 6, 2010 letter from Amegy to Southern Jet regarding the GIII Jet; and |
| Exhibit 22: | August 15, 2011 e-mail from Host Hotels to Amegy attaching documents necessary to transfer and redeem partnership units; |

## BACKGROUND FACTS

*A.    Negotiation of the $15 million loan.*

10.    Defendant William B. Johnson ("Johnson") began negotiations with Amegy Bank National Association ("Amegy")[1] for a loan in early 2008.  Johnson represented he was seeking a loan of fifteen million dollars ($15,000,000.00), part of which was to be used by Defendant Monarch Flight II, LLC ("Monarch Flight") to buy a 1983 Gulfstream Aerospace G-1159A GIII Jet (the "GIII Jet") and to make improvements thereto, and the remainder of which was to be used to complete a development project in the Bahamas, known as Orchid Bay, and for other purposes. *See* Promissory Note, Exh. 1 at ¶ 8.

11.    Defendant, John T. Bobo, an attorney with the firm of Bobo, Hunt, White & Nance, An Association of Attorneys (collectively, "Bobo") was Johnson's lawyer during the time period the loan negotiations were taking place.  Bobo represented Johnson in substantially all respects in acquiring the loan, with Bobo himself conducting the vast majority of the loan negotiations with Amegy.  In addition to negotiating the terms and conditions of the loan, Bobo also appeared to have extremely complete knowledge of Johnson's assets.  By way of example, Bobo represented to Amegy certain assets Johnson had that could be used as collateral, and the value of these assets.

---

[1] Herein, "Amegy" is defined to include Amegy and  its counsel, Nathan Sommers Jacobs ("NSJ").

B.      *The loan documents, and Johnson's obligations pursuant to the same.*

12.     As part of the loan transaction, Johnson, as managing member of Monarch Flight, executed a $15 million Promissory Note obligating Monarch Flight, as borrower, to pay Amegy, the lender, the $15 million plus interest. *See* Promissory Note, Exh. 1.  Pursuant to the terms of the Promissory Note, from execution until maturity, Monarch Flight was required to make monthly payments of interest only, due and payable on the first day of each month. *Id.* at ¶ 3. All outstanding interest and principal was due and payable on May 1, 2011. *Id.*  Upon an "Event of Default" under the Promissory Note, Amegy had the right to: (i) declare the entire unpaid principal and accrued interest on the Promissory Note immediately due and payable, (ii) foreclose or otherwise enforce any security interest granted to Amegy, or (iii) "take any and all other actions available to [Amegy] under this Note, at law, in equity or otherwise." *Id.* at ¶ 22. An "Event of Default" includes: (i) failure to pay the Note or any installment of the Note (whether principal or interest) when due; (ii) a representation made by Johnson or Monarch Flight in any report or notice that is false, misleading, or erroneous in any material respect when made; (iii) a failure by Johnson or Monarch Flight to perform, observe, or comply with any covenant, agreement, or term contained in the Promissory Note, the Security Agreement, the Aircraft Security Agreement, or the Guaranty Agreement.  *Id.* at p. 3 ("Event of Default" sections (a), (b), and (c)).

13.     To secure the $15 million Promissory Note, Johnson, in his individual capacity, executed a Guaranty Agreement, obligating him to pay all of the obligations on the Promissory Note (including the $15 million in principal, interest, attorneys' fees, and post-judgment interest) in the Event of a Default by Monarch Flight. *See* Guaranty Agreement, Exh. 2 at ¶¶ 1, 4, 15.

14.     In addition to the Guaranty Agreement, two security agreements pledging collateral were also executed. The first Security Agreement was between Johnson, in his

individual capacity, and Amegy.  *See* Security Agreement, Exh. 3.  By way of the Security Agreement, Johnson collaterally assigned and pledged, and granted to Amegy a security interest in and to his 825,427 units of partnership interest in Host Hotels & Resorts, L.P., any shares of Host Hotels & Resorts, Inc. owned by Johnson as a result of the redemption or exchange of the partnership units, and all products and proceeds from the partnership units and or the related stock.  *Id.* at § 1.1. Host Hotels & Resorts, L.P. and Host Hotels & Resorts, Inc. are collectively referred to herein as "Host Hotels" unless otherwise specifically indicated.   The Security Agreement forbade Johnson from selling, assigning, conveying, pledging, or otherwise disposing of the partnership units or the related stock without the prior written consent of Amegy. *Id.* at § 3.2.  Upon the occurrence of an "Event of Default" as defined in the Promissory Note, the Security Agreement granted Amegy all rights and remedies of a secured party under the UCC, which rights and remedies included the ability of Amegy to "collect, receive, or take possession of the [partnership units and related stock] or any part thereof," to "sell or otherwise dispose" of the partnership units and related stock, or to cause the partnership units and related stock to be transferred into its name.  *Id.* at § 5.2(b), (c).

15.    The second security agreement is the Aircraft Security Agreement, which was between Monarch Flight and Amegy.  *See* Aircraft Security Agreement, Exh. 4.   By this agreement, Monarch Flight granted Amegy a security interest in the GIII Jet. *Id.* at ¶ 2.  Johnson signed both the Promissory Note and the Aircraft Security Agreement on behalf of Monarch Flight.   Monarch Flight specifically agreed to grant Johnson the authority to enter into the Promissory Note and the Security Agreement through resolutions contained in a document titled "Officer's Certificate."  *See* Officer's Certificate, Exh. 5.

16.     Amegy filed two UCC-1 Financing Statements to perfect its security interests, one covering the collateral described in the Security Agreement, and a second covering the collateral described in the Aircraft Security Agreement. Specifically, on May 7, 2008, Amegy filed a UCC-1 Financing Statement with the Georgia Secretary of State covering Johnson's partnership units in Host Hotels and related stock;  Amegy filed a UCC-1 Financing Statement with the Delaware Secretary of State covering the GIII Jet on May 6, 2008.  *See* Exhs. 6 and 7.

17.     Under the Promissory Note, Monarch Flight agreed to pay Amegy for all reasonable costs, expenses, and attorneys' fees incurred in connection with the enforcement of the Promissory Note or any other loan document, and it further agreed to indemnify Amegy from "any and all losses, liabilities, claims, damages, penalties, judgments, disbursements, costs and expenses (including attorneys' fees)" which arise from or relate to "any breach by [Monarch Flight] of any representation, warranty, covenant or other agreement contained in any of the loan documents." *See* Promissory Note, Exh. 1 at ¶¶ 23, 28.   Johnson agreed in the Guaranty Agreement he was responsible for all costs, expenses, and attorneys' fees incurred by Amegy in connection with the preparation, administration, enforcement, or collection of the Guaranty Agreement.  *See* Guaranty Agreement, Exh. 2 at 15. Likewise, the Security Agreement and the Aircraft Security Agreement both require that Amegy be awarded all costs, expenses, and attorneys' fees incurred related to preservation and maintenance of the collateral, sale of the collateral, and enforcement of the agreements. *See* Security Agreement, Exh. 3 at §§ 1.2(d), 6.1; Aircraft Security Agreement, Exh. 4 at ¶ 6.

C.   '   *Collateral securing the loan.*

18.     The $15 million loan was originally intended to be secured by the GIII Jet, a horse farm owned by Johnson in Shelbyville, Tennessee, and by Johnson's personal guarantee of payment and performance of the loan. *See* Promissory Note, Exh. 1 at ¶ 5(b).  Johnson failed,

however, to timely provide the items Amegy needed to take a lien on the horse farm, including a complete legal description or a survey of the horse farm.

19.     Consequently, Johnson offered, and Amegy agreed to substitute, Johnson's ownership interest in 825,457 convertible partnership units in Host Hotels as collateral in place of the horse farm. *See* Promissory Note at ¶ 5(a).  All parties agreed that this substitution of the partnership units for the horse farm was only temporary, and Johnson promptly would grant Amegy a lien on the horse farm.  *See* April 29, 2008 email from Bobo, Exh. 10 ("It is my understanding that our clients have reached an agreement regarding **temporary** collateral until the real estate issue can be resolved") (emphasis added).

20.     Beginning in May of 2008 and for many months thereafter, Amegy continued unsuccessfully to attempt to obtain a lien on Johnson's horse farm. During this time, Bobo had multiple conversations with Amegy regarding this topic.

21.     Although, in accordance with applicable law, Amegy had filed a UCC-1 Financing Statement perfecting its security interest in the partnership units in Host Hotels & Resorts, L.P. and the proceeds thereof, Amegy also contacted Host Hotels and told it that Amegy was taking a pledge of partnership units from a limited partner, and that it wanted Host Hotels to provide a control agreement.  *See* UCC-1 Filing Statement, Exh. 6.  Host Hotels refused to provide Amegy the control agreement, however, so Amegy requested that Bobo assist in obtaining Host Hotels' cooperation.  *See* April 30, 2008 email from Amegy to Bobo, Exh. 11. No control agreement was ever provided by Host Hotels.

D.     *Monarch Flight defaults on the loan.*

22.     Six months after the loan was initially funded, Monarch Flight defaulted on payment.  Pursuant to the Promissory Note, monthly payments were to be made by the first day of each month commencing on July 1, 2008 and continuing until maturity of the loan on May 1,

2011. *See* Promissory Note, Exh. 1 at ¶ 3.  Monarch Flight did not make the October 1, 2008 payment until October 24, 2008.  The December 1, 2008 payment was late as well, it was not received until December 31, 2008.  Likewise, the January 1, 2010 payment was not made until January 28, 2010.

23.     During the year 2009, Amegy and Bobo conferred many times regarding the delinquent payments, the failure to make the paydown required by the Promissory Note, and what to do to remedy the default.

24.     On October 28, 2009, Amegy sent Monarch Flight (attention Johnson) and Bobo a demand letter requesting: (1) Monarch's financial statement; (2) Johnson's recent financial statement; (3) access to the GIII Jet to conduct an appraisal; (4) a copy of the Host Hotels partnership agreement; (5) evidence of dividends Johnson received from his Host Hotels units. Bobo confirmed that he would provide the desired information, and that after the renovations were complete, Amegy could view the GIII Jet to conduct an appraisal. *See* November 9, 2009 letter from Bobo to Amegy, Exh. 12.  Bobo ultimately provided Johnson's dividend statement from Host Hotels.

25.     On December 10, 2009, Amegy sent a letter to Monarch Flight (attention Johnson) and Bobo, formally demanding Monarch Flight make a 50 percent paydown of the loan, and informing the parties that Amegy intended to accelerate the note if the paydown was not received by December 31, 2009.  *See* December 10, 2009 letter, Exh. 13.  By return letter dated December 31, 2009, Bobo confirmed that Johnson had 825,457 partnership units in Host Hotels, that the units had a value of $9,666,101.44, and that the units were pledged to Amegy. *See* December 31, 2009 Letter, Exh. 8.

E.      *Unbeknownst to Amegy, and in direct violation of the terms of the Security Agreement, Johnson sold the partnership units.*

26.     On January 5, 2010, the second business day after Bobo's December 31, 2009 letter, Johnson redeemed his interest in the partnership units. *See* Notice of Redemption, Exh. 9. Specifically, Johnson either converted the pledged partnership units to cash, or he converted the pledged partnership units to stock and then liquidated the stock.   In any event, he kept the proceeds. Johnson deliberately concealed the fact that he sold Amegy's collateral in violation of the Security Agreement. *See* Security Agreement, Exh. 3 at § 3.2 ("Debtor shall not sell, assign, convey, pledge or otherwise dispose of the Collateral or any part thereof without the prior written consent of [Amegy]."). In addition, Johnson failed to account to Amegy for the proceeds of such sale as required by the Security Agreement and Texas law. *Id.* at §§ 1.1, 3.4.

27.     Further, it is apparent that prior to converting and purchasing Johnson's partnership units, Host Hotels either did not check for, or chose to ignore, the UCC-1 Amegy had filed on May 7, 2008 to perfect its security interest in the partnership units.   *See* UCC-1 Financing Statement, Exh. 6. By failing to perform the requisite due diligence and checking the UCC filings before converting and purchasing Johnson's partnership units (particularly when Host Hotels had been informed that Amegy had taken a pledge of partnership units from a limited partner), and by refusing to provide a control agreement as Amegy requested, Host Hotels permitted Johnson to violate the Security Agreement and Texas law.

F.      *Host Hotels failed to mention to Amegy anything about the sale of the partnership units.*

28.     On January 6, 2010, the same day Host Hotels received Johnson's Notice of Redemption, Amegy had a telephone conversation with Host Hotels.  During that conversation, Amegy requested that Host Hotels provide the partnership agreement, and that Host Hotels acknowledge that if Amegy had a security interest in a limited partner's partnership interest,

Amegy had the right to convert and sell the units. Host Hotels told Amegy that Amegy had no present right to convert and sell the units, and therefore Amegy would have to foreclose the partnership units in order to convert them.

G.     *Bobo was conspicuously silent about Johnson's sale of his partnership units.*

29.     On January 12, 2010, Bobo wrote Amegy acknowledging that Johnson was delinquent in payment on the Promissory Note. *See* January 12, 2010 email from Bobo to Amegy, Exh. 14  Nonetheless, Bobo assured Amegy that the delinquency would be resolved, because Johnson was awaiting a deal to close that would provide sufficient funds for him to make the delinquent January payment. *Id.* Notwithstanding that Bobo was apparently very aware of Johnson's business and assets, he did not say one word about the fact that Johnson had sold his partnership units.

H.     *Amegy accelerates the loan, Bobo leaves the picture, the false representations continue.*

30.     On March 4, 2010, Amegy sent Monarch Flight (attention Johnson) and Bobo a notice of acceleration. *See* March 4, 2010 letter, Exh. 15. Less than two weeks later, a new attorney, David Thompson ("Thompson"), made his initial appearance on behalf of Johnson and Monarch Flight. Specifically, on or about March 19, 2010, Thompson contacted Amegy to say that Johnson wanted to meet with Amegy because he desired to come to a resolution. Amegy and Thompson also discussed the collateral securing the loan, but Thompson made no mention that Johnson had previously converted and sold the partnership units.

31.     On or about March 26, 2010, Johnson himself finally had a telephone call with Howard Schramm and Joe Argue, senior officers at Amegy. Like his lawyers, Johnson expressed his interest in resolving the loan delinquency, but he made no mention whatsoever that he had sold his partnership units and related stock in violation of the Security Agreement and Texas law.

32.     For the duration of March and April of 2010, Amegy and Thompson had several additional conversations regarding the loan and the collateral.  Thompson and Amegy exchanged multiple proposals concerning resolution of the loan, none of which were ever agreed upon and adopted. *See* April 13, 2010 letter from Thompson to Amegy, Exh. 16; April 23, 2010 letter from Amegy to Thompson, Exh. 17; May 11, 2010 letter from Amegy to Monarch Flight and Thompson, Exh. 17.  Even though there was no clear resolution on how to bring Monarch Flight current on the loan, Thompson confirmed by letter dated April 13, 2010 that the collateral for the Promissory Note "consists of" the partnership units and related stock and the GIII Jet. *See* April 13, 2010 letter from Thompson, Exh. 16.

33.     Amegy continued to contact Host Hotels in the spring and summer of 2010.  During one conversation on April 14, 2010, Amegy specifically asked Host Hotels what the process was for liquidating partnership units. Host Hotels responded to this question by telling Amegy that it should submit evidence of its foreclosure after it was complete.

I.     *Johnson and Monarch Flight continue to delay and avoid payment of the loan, and to cover-up Johnson's sale of the partnership units.*

34.     Throughout the summer of 2010, Amegy and Thompson had many discussions about Johnson's intentions and plan to pay off the loan.  Amegy continued to assert its rights to alternative proposals and a paydown, and Johnson continued to refuse to agree to any of Amegy's proposals or to a paydown.  In a letter dated May 21, 2010, Johnson's tactics even went so far as to threaten that it if Amegy continued to pursue a paydown, Johnson would pursue a claim against Amegy. *See* May 21, 2010 letter from Thompson to Amegy, Exh. 19.

35.     On or about July 21, 2010, Amegy requested to Thompson that Johnson convert his partnership units to stock.  Thompson committed to relay this request to Johnson. On or about July 27, 2010, Thompson told Amegy that Johnson did not want to convert the units to stock,

because it would cause him an adverse tax consequence. Whether Thompson knew the truth about Johnson's sale of the partnership units at that time is unknown, but what is abundantly clear is that Johnson deliberately lied and concealed the truth from Amegy.

36.     Over the month of August 2010, Amegy and Thompson continued to have numerous email and telephone conversations in an attempt to reach an agreement on payment.

J.     *Amegy moves forward on repossessing and foreclosing the GIII Jet, a task made difficult because of Johnson's deliberate concealment of the GIII Jet.*

37.     In late August of 2010, Amegy determined to pursue its option of repossessing and foreclosing on the GIII Jet which was collateral securing the loan. *See* Aircraft Security Agreement, Exh. 4.   To handle the foreclosure, Amegy retained Bob Nygren with Aerosmith/Penny to act as an aircraft broker and Garrett Pendleton as Georgia counsel (Amegy believed the GIII Jet was located in Georgia as required by the Aircraft Security Agreement). On September 23, 2010, Amegy sent Monarch Flight (attention Johnson) and Thompson a letter informing them that unless the loan was brought current, Amegy would prevent Johnson's access to the GIII Jet. *See* September 23, 2010 letter, Exh. 20.   Amegy also sent a letter to Southern Jet, the party who was storing and flying the GIII Jet on behalf of Johnson, directing that they should take instructions regarding the GIII Jet only from Amegy until further notice, and that they were to ground the GIII Jet and to cease taking instructions or directions from Johnson regarding the GIII Jet. *See* October 6, 2010 letter, Exh. 21.

38.     Apparently asserting Amegy's rights to the GIII Jet was finally enough to get Johnson's attention, but unfortunately, it did not obtain the reaction for which Amegy was hoping.  After making the November 1, 2010 payment (which was not made until January 21,

2011 by a check drawn on Johnson's account[2] at JPMorgan Chase Bank, N.A.), Monarch Flight made no further payments of principal or interest.

39.     In addition, on or about May 10, 2011, Amegy learned that Johnson had moved the GIII Jet to Tennessee, in violation of the Aircraft Security Agreement. *See Aircraft Security Agreement, Exh. 4 at ¶¶ 2, 3(G).* Amegy learned of the GIII Jet's location, not from Johnson, but from Southern Jet. Southern Jet had failed to disclose the whereabouts of the GIII Jet to Amegy until it received a signed writ of possession, even though Southern Jet and Amegy frequently conferred about numerous issues related to the GIII Jet over a period of several months. In other words, Southern Jet did not disclose information that it knew was vital to Amegy (presumably at Johnson's direction) until Amegy got a court order mandating possession of the plane and therefore disclosure of this information. Southern Jet agreed during a conversation with Amegy on May 10, 2011 that it would comply with the writ of possession, and at Johnson's direction would cooperate with Amegy. Southern Jet flew the GIII Jet to its hangar in Georgia. The GIII Jet is currently scheduled to be sold at a public foreclosure sale on September 7, 2011.

K.     *Delay, avoid, conceal, delay, avoid, conceal—the pattern continues.*

40.     Johnson, through Thompson, made repeated assurances to Amegy at the end of 2010 and during the first quarter of 2011 that payments would be brought current. On December 20, 2010, Thompson reported that Johnson was anticipating that his "big transaction" was scheduled to close no later than early January, and that at that time, Johnson would bring the

---

[2] It is important to note that various banks and checking accounts held by multiple entities were used to make the payments on the Promissory Note. By way of example, the June 1, 2009 payment was made by a check issued from the account of "W.B. Johnson International, LLC" at Suntrust Bank. The September 1, 2010 payment was made by a check issued from the account of "W.B. Johnson Int'l, LLC" at Deutsche Bank. The November 1, 2010 payment was made by a check issued from the account of "William B. Johnson" at JPMorgan Chase Bank, N.A.

payments current.  Thompson also confirmed Johnson would pay the full principal at or before stated maturity (May 1, 2011).  Thompson made similar representations on behalf of Johnson numerous times over the next few months, with the closing of the "big transaction" that would save everything always just around the corner.  The "big transaction" never materialized, but Johnson was still touting its saving power when he requested on June 13, 2011 that Amegy grant a 30-day forbearance so that the "big transaction" could close.

41.     Pursuant to the terms of the Promissory Note, the loan matured on May 1, 2011, and all outstanding principal as well as all accrued and unpaid interest became due and payable at that time.  *See* Promissory Note, Exh. 1 at ¶ 3.  Failure to pay the interest and principal upon maturity of the note unequivocally constitutes an "Event of Default" [3] as defined by the Note. *Id.* at ¶ 7.  As of the date of the date of this pleading, Johnson has paid neither principal nor accrued interest on the Promissory Note.

42.     Amegy reached out to Host Hotels again in August of 2011.  After several unsuccessful attempts, Amegy finally reached Andy Bullard, the general counsel for Host Hotels' general partner. Amegy explained its desire to proceed with foreclosure of Johnson's partnership units, and again asked Bullard questions concerning conversion and sale of the partnership units. Bullard assured Amegy he would put it in contact with the appropriate person at Host Hotels to answer these questions.

43.     Several hours later, Host Hotels sent Amegy the information it had been trying, unsuccessfully, to obtain for months.  Specifically, Host Hotels sent an email providing the details and the necessary forms to complete the unit transfer and conversion process. *See* e-mail

---

[3] Amegy contends that there were other "Events of Default" prior to maturity of the Promissory Note on May 1, 2011 that resulted in the Promissory Note being due and payable prior to May 1, 2011.  Since, however, May 1, 2011 has come and gone, there is no need to discuss those other Events of Default at this time.

from Host Hotels dated August 15, 2011, Exh. 22. Amegy's joy in finally obtaining sufficient information to foreclose on and convert the partnership units was, unfortunately, extremely short-lived. Approximately one hour after Host Hotels provided the requisite information, Host Hotels called to report that Johnson had converted and liquidated his interests in his partnership units a year and a half before, on January 5, 2010.

44. Hoping for a logical and non-fraudulent explanation for this devastating information, Amegy called Thompson. Thompson claimed to have no prior knowledge that Johnson had sold the partnership units, and assured Amegy he would inquire with Johnson.

45. In the meantime, Amegy asked Host Hotels to provide the documentation supporting Johnson's conversion and sale of his partnership units. Host Hotels provided a "Notice of Redemption" dated January 5, 2010, signed by Johnson, redeeming his interests in 825,457 units in Host Hotels. *See* Notice of Redemption, Exh. 9. In the Notice of Redemption, Johnson made a plethora of false representations concerning his ownership rights in the partnership units:

> The undersigned hereby represents, warrants and certifies that the undersigned (a) has marketability and unencumbered title to such Units, free and clear of the rights of or interests of any other person or entity, (b) has the full right, power and authority to redeem and surrender such Units as provided herein and (c) has obtained consent or approval of all persons or entities, if any, having the right to consult or approve such redemption and surrender.

*Id.*

46. Amegy forwarded a copy of this Notice of Redemption to Thompson. After talking with Johnson, Thompson said that he would not discuss the sale of the pledged units with Amegy, so as not to jeopardize Johnson's rights; however, he reported that the "big transaction" that would save everything was still pending. Amegy urged Thompson to provide written documentation of this "big transaction" and its status, explaining that this was the only way

Amegy would consider deferring taking action.  Johnson completely refused Amegy's request.

Thus, Amegy was left with no choice but to file this lawsuit.

CAUSES OF ACTION AND CLAIMS FOR RELIEF

Count 1:  Fraud and Misrepresentations by Johnson

47.    Johnson knowingly and recklessly made false and material statements, promises, and representations of fact, opinion, and future performance.  Johnson intended to and actually communicated these misrepresentations to Amegy as described above.  Johnson also failed to disclose material facts, which Johnson had a duty to disclose and which made Johnson's representations misleading.   The specific misrepresentations and non-disclosures include, without limitation, the following:

A.    representing to Amegy that he would not sell, assign, convey, pledge or otherwise dispose of his 825,457 units of partnership interest in Host Hotels, except in accordance with the terms of the Security Agreement and the Promissory Note;

B.    converting and selling his 825,457 units of partnership interest in Host Hotels in violation of the terms of the Security Agreement and the Promissory Note, and concealing the sale and his retention of the proceeds of the sale;

C.    representing to Amegy that he had not converted and sold his 825,457 units of partnership interest in Host Hotels after the conversion and sale had already taken place; and

D.    representing to Amegy that he would grant it a lien on his horse farm to secure the Promissory Note, and representing that the horse farm would be substituted for collateral in place of his partnership units.

48.     With respect to the representations and non-disclosures described above, each was material, false, and at the time they were made, Johnson either knew the same were false or made them recklessly, as a positive assertion, or each was made in reckless disregard of the truth. Johnson made each representation or non-disclosure with the intent that Amegy would rely on it and act or refrain from taking action.  Amegy relied on each representation or non-disclosure to its detriment.

49.     With respect to Johnson's sale of the partnership units in Host Hotels, Johnson remained silent that the sale had occurred with the intent that Amegy would rely on the non-existence of the material information and when he had a duty to speak.  Amegy relied on the non-existence of the material information.  On at least one occasion, Johnson also made intentional misrepresentations to Amegy, the purpose of which was to induce Amegy into believing that he was still the owner of the partnership units. Johnson was required to disclose the sale of the Partnership Units to Amegy pursuant to a duty imposed upon him by law.  Amegy has been damaged in an amount that exceeds the jurisdictional limits of this Court.

### Count 2:  Conversion by Johnson

50.     By converting and selling the partnership units and related stock, and keeping the proceeds from the sale, Johnson has converted monies and interests belonging to Amegy.  At all times relevant to this action, Amegy owned, possessed, or had the right to immediate possession of the partnership units and the related stock, and the proceeds derived from the sale of the partnership units, and Amegy is entitled to possess the proceeds.  Amegy seeks to recover the sums Johnson received from the sale of the partnership units, plus exemplary damages.

Count 3: <u>Conversion by Host Hotels</u>

51.     By converting and purchasing Johnson's partnership units and related stock, and giving Johnson the proceeds from the sale, Host Hotels has converted monies and interests belonging to Amegy.  At all times relevant to this action, Amegy owned, possessed, or had the right to immediate possession of the partnership units and the related stock, and the proceeds derived from the sale of the partnership units, and Amegy is entitled to possess those proceeds. Amegy seeks to recover the sums Johnson received from the sale of the partnership units, plus exemplary damages.

Count 4: <u>Money had and Received against Johnson</u>

52.     By converting and selling the partnership units and related stock, and keeping the proceeds from the sale, Johnson wrongfully holds money that belongs to Amegy. As such, Amegy asserts a claim against Johnson for money had and received.

Count 5: <u>Breach of Promissory Note by Monarch Flight</u>

53.     Monarch Flight is the "borrower" of the $15 million represented in the Promissory Note. *See* Promissory Note, Exh. 1.  Pursuant to the terms of the Promissory Note, all outstanding principal and accrued interest of the Promissory Note is currently due and payable. Monarch Flight is in default of the Promissory Note by failing to pay the outstanding principal and accrued interest.   Amegy seeks to recover from Monarch Flight all of the outstanding principal and accrued interest due and payable pursuant to the Promissory Note.

Count 6: <u>Breach of Guaranty Agreement by Johnson</u>

54.     As a condition of the $15 million loan, Johnson, in his individual capacity, "irrevocably and unconditionally guarantees to [Amegy] the full and prompt payment and performance of the Guaranteed Indebtedness," which term was specifically defined to include "all principal of and interest on the [Promissory] Note," on the happening of an "Event of

Default" as defined by the Promissory Note. *See* Guaranty Agreement, Exh. 2 at p. 1 and ¶¶ 1, 4. As Monarch Flight is in default of the Promissory Note by failing to pay the outstanding principal and accrued interest, Amegy seeks to recover from Johnson all outstanding principal and accrued interest due and payable pursuant to the Guaranty Agreement.

Count 7:  <u>Conspiracy by All Defendants</u>

55.     As a result of the conduct described above, Amegy asserts a claim of conspiracy against Defendants Johnson, Bobo, and Host Hotels.   Each of the Defendants cooperated, colluded, and/or conspired with and among each other to accomplish the goals of the conspiracy in which they were engaged, and each of the Defendants knew or understood, or in the exercise of due care should have known, the goals and purposes of the conspiracy.  By virtue of their conduct, the Defendants are jointly and severally liable to Amegy for all damages caused to it by the conduct of any of the Defendants.

Count 8:  <u>Assisting or Encouraging by Bobo and Host Hotels</u>

56.     Amegy asserts a claim of assisting or encouraging against Defendants Bobo and Host Hotels.  Johnson committed a tort against Amegy, and knowing that Johnson's conduct constituted a tort, Bobo and Host Hotels had the intent to assist Johnson in committing the tort by giving Johnson assistance or encouragement, which assistance and encouragement was a substantial factor in causing the tort. By virtue of their conduct, Bobo and Host Hotels are jointly and severally liable to Amegy for all damages caused to it by the conduct of Johnson.

Count 9:  <u>Claim For Constructive Trust against Johnson and Monarch Flight</u>

57.     As a result of Johnson and Monarch Flight's fraudulent conduct, fraudulent loan applications, and violations of the terms of the Promissory Note, the Security Agreement, and the Guaranty Agreement, Amegy has suffered losses in excess of $15,000,000.00.   It is

unconscionable for Johnson or Monarch Flight to retain the money and property (real and personal) they received from their fraudulent and wrongful conduct, including the monies and property (real or personal) Johnson obtained from the retention of the proceeds from the conversion and sale of the partnership units.

58.     Unless a constructive trust is imposed upon the monies wrongfully gained by Johnson and Monarch Flight, whether it has been maintained separately, commingled with other funds, or used to acquire property, and any real or personal property acquired with these monies, (the "Constructive Trust Property"), Johnson and Monarch Flight will be unjustly enriched at Amegy's expense.  Johnson and Monarch Flight should be required to hold the Constructive Trust Property in trust for Amegy to satisfy the indebtedness.

### Count 10:  Claim For An Accounting against Johnson and Monarch Flight

59.     As a result of the conduct described above, Johnson and Monarch Flight wrongfully obtained money and benefits from assets rightfully belonging to Amegy.  Amegy is entitled to an accounting from Johnson and Monarch Flight of all money, assets, and benefits received by them, or which inured to their benefit, as a result of the wrongful conduct described herein.

### Count 11:  Claim For Restitution against Johnson and Monarch Flight

60.     Amegy is entitled to an order directing Johnson and Monarch Flight to make restitution of all the money, assets, and other benefits received by them by virtue of their misconduct.

### Count 12:  Punitive Damages

61.     Amegy is entitled to recover punitive damages from Defendants Johnson, Monarch Flight, Bobo, and Host Hotels.

Count 13:  <u>Attorneys' Fees</u>

62.     As a result of Monarch Flight, Johnson, Host Hotels and Bobo's actions and inactions, Amegy was compelled to retain the undersigned attorneys to file this suit to collect the amounts due and to enforce Amegy's rights.  Amegy is entitled to recover from Defendants its reasonable attorneys' fees incurred in bringing and prosecuting this action pursuant to the following:

A.  Texas Civil Practice and Remedies Code § 38.001;

B.  the Promissory Note, Exh. 1 at ¶¶ 23, 28;

C.  the Guaranty Agreement, Exh. 2 at ¶ 15;

D.  the Security Agreement, Exh. 3 at §§ 1.2(d) and 6.1;

E.  the Aircraft Security Agreement, Exh. 4 at ¶ 6; and

F.  Texas common law.

Count 14:  For an Ex Parte Temporary Restraining Order, Temporary Injunction
<u>and Permanent Injunction against Johnson and Monarch Flight</u>

63.     Johnson and Monarch Flight's past actions justify the expectation that they will continue to breach their obligations and duties to Amegy and will take for their own personal benefit Amegy monies and property that are rightfully subject to the constructive trust sought herein.  Unless Johnson and Monarch Flight are restrained and enjoined as described in the demand for judgment from disposing of the cash, property, and assets obtained by their fraudulent conduct, including but not limited to the Constructive Trust Property, Amegy will be irreparably harmed in that it will not be able to recover the money and other property taken from it, and it will have no adequate remedy at law.

25

## CONDITIONS PRECEDENT

64.     All conditions precedent to Amegy's recovery on the claims stated in this complaint have occurred, been performed, been waived, or been excused.

## DEMAND FOR JUDGMENT

For these reasons, Plaintiff Amegy Bank National Association requests that Defendants Monarch Flight II, LLC, William B. Johnson, John T. Bobo, Bobo, Hunt, White & Nance, An Association of Attorneys, Host Hotels & Resorts, L.P., and Host Hotels & Resorts, Inc. be cited to appear and answer in this suit, and that upon final trial or hearing, it be awarded the following relief:

(1)     Amegy's actual, consequential, and incidental damages in excess of the jurisdictional limits of this Court;

(2)     Imposition of a constructive trust upon all money, property, assets, or other benefits, and upon all property (real or personal) acquired with the money derived by Johnson and Monarch Flight pursuant to the $15 million loan from Amegy, and from the money Johnson wrongfully retained when he converted and sold the partnership units, whether such money has been maintained separately, commingled with other funds, or used to acquire property;

(3)     An accounting for all benefits derived by Johnson and Monarch Flight by virtue of their wrongful conduct;

(4)     A temporary restraining order, temporary injunction and permanent injunction restraining and enjoining Johnson and Monarch Flight, and their employees, agents, representatives, attorneys, partners, creditors, bankers (including, but not limited to, JPMorgan Chase Bank, N.A., Deutsche Bank, and Suntrust Bank),

26

servants, all persons acting by or under their authority, and all persons action in concert or participation with them or others, and who shall receive actual notice of this Order (the "Persons Enjoined") by facsimile, e-mail, or otherwise, commanding them forthwith, to cease, desist, and refrain from, directly or indirectly:

a.      transferring, selling, assigning, dissipating, concealing, alienating, leasing, pledging, encumbering, impairing, offsetting, or otherwise disposing of in any manner the Constructive Trust Property;

b.      transferring, selling, assigning, dissipating, concealing, alienating, leasing, pledging, encumbering, impairing, offsetting, or otherwise disposing of in any manner any funds with which the Constructive Trust Property has been commingled, or any property that has been purchased, leased, or otherwise acquired in any way, in whole or in part, with Constructive Trust Property;

c.      causing or aiding anyone who does or attempts to transfer, assign, dissipate, conceal, alienate, lease, pledge, encumber, impair, offset, or otherwise dispose of in any manner Constructive Trust Property;

d.      taking or causing to be taken, any action which would have the effect of concealing or removing from the jurisdiction of this Court, or that would have the effect of depreciating, damaging, or in any way diminishing the value of any of Constructive Trust Property; and

e.      destroying, concealing, altering, or disposing of, in any manner, directly or indirectly, any financial, business, or personal records, or other

documents, including electronically stored information, under the care, custody, or control of Johnson or Monarch Flight, that concern or relate to Defendants' assets, or any of Defendants' financial or business or personal interests, including, but not limited to, records such as checking accounts, financial statements, and tax returns.

(5)     Exemplary damages;

(6)     Pre-judgment and post-judgment interest as provided by law;

(7)     Costs of suit;

(8)     Reasonable attorneys' fees and expenses as provided by law; and

(9)     All other relief, general or special, at law or in equity, to which Amegy may be justly entitled.

Dated:  August 30, 2011

Respectfully submitted,
GARDERE WYNNE SEWELL LLP


By:_____*/s/ Geoffrey H. Bracken*_____
Geoffrey H. Bracken
State Bar No. 02809750
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007
Telephone:  713.276.5500
Facsimile:  713.276.5555

ATTORNEY-IN-CHARGE FOR PLAINTIFF,
AMEGY BANK NATIONAL ASSOCIATION

OF COUNSEL:
Peter Scaff
State Bar No. 24027837
Rhonda Weiner
State Bar No. 24047732
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007
Telephone:  713.276.5500
Facsimile:  713.276.5555

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMEGY BANK NATIONAL ASSOCIATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO._____ |
| v. | § | |
| | § | |
| MONARCH FLIGHT II, LLC, | § | |
| WILLIAM B. JOHNSON, | § | |
| JOHN T. BOBO, | § | |
| BOBO, HUNT, WHITE & NANCE, | § | |
| AN ASSOCIATION OF ATTORNEYS, | § | |
| HOST HOTELS & RESORTS, L.P., AND | § | |
| HOST HOTELS & RESORTS, INC. | § | |
| | § | |
| Defendants. | § | |

VERIFICATION IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR INJUNCTIVE RELIEF

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority on this day personally appeared Ann Jacobs, who, after being duly sworn, stated on her oath the following:

"My name is Ann Jacobs, and I am an attorney with the law firm of Nathan Sommers Jacobs, A Professional Corporation. I represented, and continue to represent, Amegy Bank National Association in conjunction with a $15 million loan Amegy Bank National Association made to Defendant Monarch Flight II, LLC in May of 2008. I have reviewed Amegy's Original Complaint and Verified Application for Injunctive Relief, and based on my personal knowledge, the factual allegations contained in paragraphs 18-21, 23, 25-30, 32-37, 40, and 42-46 are true and correct."

_____
ANN JACOBS

August 30, 2011.

_____
Notary Public in and for the
State of T E X A S

TAMMY T. MORRIS
Notary Public, State of Texas
My Commission Expires 05-12-2014

30

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMEGY BANK NATIONAL ASSOCIATION | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | C.A. NO._____ |
| | § | |
| MONARCH FLIGHT II, LLC, | § | |
| WILLIAM B. JOHNSON, | § | |
| JOHN T. BOBO, | § | |
| BOBO, HUNT, WHITE & NANCE, | § | |
| AN ASSOCIATION OF ATTORNEYS, | § | |
| HOST HOTELS & RESORTS, L.P., AND | § | |
| HOST HOTELS & RESORTS, INC. | § | |
| | § | |
| Defendants. | § | |

VERIFICATION IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR INJUNCTIVE RELIEF

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority on this day personally appeared Howard

Schramm, who, after being duly sworn, stated on his oath the following:

"My name is Howard Schramm, and I am a Senior Vice President of Amegy
Bank National Association, that bank that loaned Defendant Monarch Flight II,
LLC $15 million in May of 2008. I have reviewed Amegy's Original Complaint
and Verified Application for Injunctive Relief, and based on my personal
knowledge, the factual allegations contained in paragraphs 10, 11, 22, 24, 31, 38-
39, and 41 are true and correct."

HOWARD SCHRAMM

August 30, 2011.

Notary Public in and for the
State of T E X A S

LAURICE E MONTALBANO
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 08/10/15

31

HOUSTON 1123987