**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AMEGY BANK NATIONAL ASSOCIATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:11-CV-3218 |
| | § | |
| MONARCH FLIGHT II, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This dispute arises out of a $15 million loan made by the plaintiff, Amegy Bank National Association.  Amegy sued Monarch Flight II, LLC ("Monarch"), the borrower, and William B. Johnson, the guarantor, after Monarch defaulted.  Amegy also sued John T. Bobo, an attorney who represented Monarch and Johnson in connection with the Amegy loan; Bobo's law firm, Bobo, Hunt, White & Nance; Host Hotels & Resorts L.P., an entity in which Johnson owned partnership units that were pledged as collateral for the loan; and Host Hotels & Resorts, Inc., a corporation whose shares Johnson would receive if he chose to redeem his partnership units in Host Hotels & Resorts L.P.  Amegy alleges the right to recover the outstanding principal and interest, as well as attorneys' fees.  Amegy has applied for a preliminary injunction, seeking to freeze assets owned by Johnson to ensure that sufficient assets will be available to satisfy a judgment.

The court held a hearing on the application for a preliminary injunction.  Johnson testified and both parties introduced documents into evidence.  Based on the pleadings; the motion, supplement, and response; the testimony and exhibits; the arguments of counsel; and the relevant

law, this court denies the motion for a preliminary injunction.  The reasons for this ruling are explained below.

## I.      Background

Johnson is the sole owner and managing member of Monarch.  In 2008, Monarch borrowed $15 million from Amegy.  The loan was documented by a May 1 promissory note executed by Johnson as managing member of Monarch.  Monarch was required to make monthly interest payments from July 1, 2008 until May 1, 2011, when all outstanding principal and accrued interest became due.  (Docket Entry 1-1, at 1).  The $15 million was to be used to finance the purchase, repair, and upgrade of a Gulfstream Aerospace GIII Jet; to finance the development of Orchid Bay, a real estate development project in the Bahamas; and "for any other Borrower or Guarantor purpose."  (*Id.*, at 6).

Amegy also entered into a guarantee agreement with Johnson and two security agreements, one with Johnson and one with Monarch.  In the guarantee agreement, Johnson agreed to assume Monarch's obligations under the note if Monarch defaulted.  (Docket Entry No. 1-2).  The two security agreements pledged collateral to secure Amegy's loan.    The first security agreement—between Amegy and Monarch—granted Amegy a security interest in the GIII Jet.  (Docket Entry No. 1-4).  The second security agreement—between Johnson and Amegy—granted Amegy a security interest in 825,457 Host Hotels & Resorts, L.P. partnership units that Johnson personally owned and in any shares of Host Hotels & Resorts, Inc. that Johnson would own as a result of redeeming the partnership units.  (Docket Entry No. 1-3).  In this agreement, Johnson represented and warranted that he owned the partnership units "free and clear of any lien, security interest, pledge, claim, or other encumbrance . . . or any right or option on the part of a third person

2

to purchase or otherwise acquire" them. (*Id.*, at 3). Amegy filed UCC-1 financing statements to perfect its security interests in the aircraft and partnership units. (Docket Entry No. 1-6; Docket Entry No. 1-7). It is unclear whether the filing of a UCC-1 financing statement was sufficient, by itself, to perfect Amegy's security interest in the partnership units.

On April 24, 2008—one week before signing the second security agreement—Johnson sent Amegy a letter that stated, in relevant part:

> I have attached the Host Hotels & Resorts, L.P. written confirmation dated January 15, 2008 showing 825,457 partnership units. These particular units can be converted to stock at any time and sold. I prefer to keep them as partnership units at the present time . . . . I will agree that when I dispose of this particular portion of my Host Hotels & Resorts, L.P. units, I will be happy to pay down 50% of the balance of the $15 million dollar loan that I will have with you.

(Docket Entry No. 1-10, at 2). The agreement granting Amegy a security interest in the partnership units did not specify that Johnson could dispose of the units if he paid 50% of the balance of the loan. Instead, the agreement stated that Johnson would not "sell, assign, convey, pledge or otherwise dispose" of the units and shares without Amegy's "prior written consent." (Docket Entry No. 1-3, at 4).

Johnson had previously entered into an agreement with SunTrust Bank relating to the same partnership units pledged to Amegy. In October 2006, Johnson obtained an $8 million loan from SunTrust and signed a promissory note and an agreement not to encumber assets. Under the latter agreement, Johnson agreed not to "transfer, create, incur, assume or suffer to exist any pledge, mortgage, trust, lien, security interest, assignment or other preferential arrangement, charge or encumbrance . . . upon or with respect to" the 825,457 Host Hotels partnership units. (Inj. Hr'g, Pl.'s Ex. 16C). Johnson renewed the SunTrust loan several times, for different amounts. In May

3

2010, Johnson signed an agreement with SunTrust in which he represented that the October 2006 agreement not to encumber the Host Hotel partnership units "remains in full force and effect and no default exists thereunder" and promised to "submit to SunTrust to apply against the loan . . . all proceeds received from either the sale or transfer" of the partnership units. (*Id.*, Pl.'s Ex. 16A).  In May 2008, when Amegy made the $15 million loan to Monarch, Johnson did not disclose to Amegy the existence of the SunTrust agreement not to encumber the partnership units.  Amegy learned about this agreement when SunTrust sued Johnson in June 2011 after he defaulted on the SunTrust promissory note.  SunTrust sued to recover the unpaid interest and principal, which at that time were $9,062,360.93.  (*Id.*).

On December 31, 2009—after Monarch made some late interest payments on the Amegy loan and after Amegy requested a 50% prepayment of the principal under section 6(b) of the promissory note—Bobo sent Amegy a letter confirming that Johnson had 825,457 partnership units in Host Hotels, that the units were pledged to Amegy, and that they had a value of $9,666,101.44. (Docket Entry No. 1-8, at 1).  Five days later, Johnson sent Host Hotels a notice exercising his right to redeem the partnership units.  In the notice, Johnson stated as follows:

> the undersigned (a) has marketable and unencumbered title to such Units, free and clear of the rights of or interests of any other person or entity, (b) has the full right, power and authority to redeem and surrender such Units as provided herein and (c) has obtained the consent or approval of all persons or entities, if any, having the right to consult or approve such redemption and surrender.

(Docket Entry No. 1-9, at 2).

4

Johnson's financial records indicate that he sold 843,199 units in Host Hotels for $9,516,052.12 on January 26, 2010.[1] (Inj. Hr'g, Pl.'s Ex. 20). By September 2010, Johnson used most of the proceeds on personal and business expenses. (*Id.*, Ex. 22). Johnson did not inform Amegy that he was selling his partnership units. Nor did he pay 50% of the loan balance, as stated in the April 24, 2008 letter to Amegy.[2]

Under the Amegy promissory note, Monarch was required to make monthly interest payments by the first day of each month from July 1, 2008 to May 1, 2011. The note defined "Event of Default" to include Monarch's failure "to pay this Note or any installment of this Note (whether principal or interest) when due." (Docket Entry No. 1-1, at 3). Monarch made its first late interest payment in October 2008. It continued to make interest payments—some late and some on time—until January 21, 2011, when it paid the monthly interest for November 2010. The November 2010 interest payment was the last Monarch made to Amegy under the promissory note. Monarch did not pay the outstanding principal and accrued interest when the note matured on May 1, 2011. Amegy attempted to foreclose on the collateral securing its loan: the aircraft and the hotel partnership units. Amegy was unable to foreclose on the partnership units because Johnson had sold them in January 2010. On September 2, 2011—three days after Amegy brought this action—Monarch filed for Chapter 11 bankruptcy. (Docket Entry No. 7-1). Because the aircraft became property of the bankruptcy estate, the Bankruptcy Code's automatic stay provision prevented Amegy from foreclosing on the aircraft.

---

[1]   The record does not explain the discrepancy between the number of units Johnson redeemed and the number of units Johnson sold.

[2]   According to Amegy, it did not learn that Johnson disposed of his units until August 2011, when Amegy contacted Host Hotels to obtain information about foreclosing on the units. (Docket Entry No. 1, at 18–19).

5

At the injunction hearing, Johnson testified that he currently owns—either individually, together with his wife, or through his various business entities—several significant assets. These include the Waterfall Farms in Shelbyville, Tennessee, and Orchid Bay, a real estate development in the Bahamas. Johnson testified that his wife and he own the Tennessee horse farm. According to Johnson, the farm was appraised at approximately $130 to $140 million. Johnson testified that he believes the appraisal was too high and estimated that the current value of the farm is between $75 and $125 million dollars. Johnson testified that he plans to "give all that" — the farm and the horses — to the veterinary school at the University of Tennessee "at a point in time," but no legal commitment with the university currently exists. Deutsche Bank has a lien on the farm for $7,000,000.

Johnson testified that the value of the real estate development in the Bahamas is several hundred million dollars. The Royal Bank of Canada has a $1 million lien on the property. Johnson owns 100% of a domestic corporation that owns 100% of a Bahamas corporation that owns Orchid Bay. Johnson testified that he is currently trying to borrow $28 million to complete the development. He did not specify what assets will be pledged as security for the loan he is working to obtain.

On August 30, 2011, Amegy filed this action to recover the outstanding principal and accrued interest due under the promissory note. Amegy's complaint asserts five causes of action against Johnson: breach of contract; conversion; fraud; money had and received; and conspiracy.[3] (Docket Entry No. 1, at 20–23). In addition to damages, Amegy seeks three equitable remedies:

---

[3]   Amegy's first amended complaint, filed on October 11, 2011, adds causes of action for theft and fraudulent transfers. (Docket Entry No. 33, at 35–36).

restitution; an accounting "for all benefits derived by Johnson . . . by virtue of [his] wrongful conduct"; and the "[i]mposition of a constructive trust upon all money, property, assets, or other benefits, and upon all property . . . acquired with the money derived by Johnson . . . pursuant to the $15 million loan from Amegy, and from money Johnson wrongfully retained when he converted and sold the partnership units." (*Id.*, at 26). After filing its complaint, Amegy applied for a preliminary injunction, (Docket Entry No. 4), and filed a supplement to that application, (Docket Entry No. 7). Amegy asks this court to freeze three types of assets: (1) all of Johnson's assets; (2) all assets that, according to Amegy, are subject to a constructive trust; and (3) "all assets belonging to or in the possession of . . . Johnson or subject to his control having a current total value, net of any lien or encumbrances, of $16,000,000." (Docket Entry No. 7, at 7). Amegy argues that without an injunction, it "will be injured because Johnson will have insufficient assets remaining to satisfy a money judgment" on its claims. (*Id.*, at 4). Amegy contends that "Johnson has already . . . transferred assets in which Amegy had a security interest"—the partnership units—"in order to place the [units] beyond Amegy's reach." (*Id.*, at 3–4). At the injunction hearing, Johnson responded that Amegy has an adequate remedy at law in the form of money damages, because Johnson and the various business entities he controls own assets worth well in excess of $15 million.

## II.    Analysis

To obtain a preliminary injunction, Amegy must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an 'extraordinary remedy' and

should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Planned Parenthood of Houston & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (internal quotation marks and citation omitted). Johnson stipulated that Amegy will likely succeed on the merits of its claim that Johnson is liable for all amounts due under the promissory note as a guarantor of that note. The parties assumed, for the injunction hearing only, that Amegy had met its burden of showing a substantial likelihood of success on the merits. The parties disputed whether Amegy had shown that it will suffer irreparable harm if this court does not issue an injunction freezing the assets it identified.

Showing irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1, at 139 (2d ed. 1995). "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). "However, the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Janvey*, 647 F.3d at 600. Even when, as here, the ultimate relief sought is money damages, "extraordinary circumstances"—such as evidence showing that the defendant is likely to become insolvent before final judgment or that the defendant intends to dissipate his assets to make a judgment awarding damages uncollectible—"may give rise to the irreparable harm required for a preliminary injunction." *Hughes Network*, 17 F.3d at 694; *see also Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 86–87 (2d Cir. 1996). The Supreme Court has

emphasized that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*

On the current record, Amegy has not made a sufficient showing of *likely* irreparable harm that would entitle it to the injunctive relief it seeks. The damages it seeks for the outstanding principal and interest due under the promissory note and attorneys' fees are fully compensable by a monetary award. Amegy has not shown that it is likely that Johnson will lack sufficient assets at the end of the litigation to satisfy a final judgment awarding damages or that there is a basis to impose a constructive trust.

Johnson testified that he owns 100% of Waterfall Farms, a 1050-acre farm in Tennessee where he conducts a horse-breeding operation. Johnson estimated that the current value of the property is between $75 and $125 million and that there is a $7,000,000 lien on the farm securing a Deutsche Bank loan. Amegy objected to Johnson's testimony about the value of the property but did not argue that the property is worth less than Johnson's estimate. Johnson's equity in this asset far exceeds the value of the outstanding bank loans that are currently due and that Johnson is responsible for, including the Amegy and the SunTrust loans. Even assuming that Johnson will further encumber this property by $28 million—the amount he is trying to borrow to complete the real estate development in the Bahamas—Johnson's equity in the farm would still be sufficient to satisfy a money judgment for Amegy. Johnson's testimony that he has a long-term plan to "give all that" to the veterinary school at the University of Tennessee at some unspecified time in the future

9

establishes no more than a possibility of irreparable harm; it does not establish a likelihood that Johnson will not own the farm when final judgment is entered. On this record, Amegy's motion for injunctive relief is denied. *See Winter*, 555 U.S. 21–22 (rejecting the Ninth Circuit's position that a preliminary injunction may be entered based only on a possibility of irreparable harm); *Sampson v. Murray* 415 U.S. 61, 90 (1974) ("'The possibility that adequate compensatory . . . relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'" (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958))).

To the extent Amegy argues that it will suffer irreparable harm because Johnson may dissipate the assets on which it seeks to impose a constructive trust, the argument fails on the current record for two reasons. First, Amegy seeks a constructive trust to ensure that Johnson will have sufficient assets to satisfy a money judgment, not to recover a unique asset. Because Amegy's claims are fully compensable by a monetary award, Amegy will not suffer irreparable harm so long as it can collect a judgment. As discussed above, Amegy has not shown a reasonable likelihood that, at the end of the litigation, Johnson's equity in his assets will be less than the amount Amegy seeks to recover under the promissory note. Second, Amegy has not shown that there is a separate basis for imposing a constructive trust under Texas law. "'A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property.'" *Talley v. Howsley*, 176 S.W.2d 158, 160 (Tex. 1943) (citation omitted). The proponent of a constructive trust must "strictly prove" the following three elements: (1) the breach of a special trust or fiduciary

relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res. *Troxel v. Bishop*, 201 S.W.3d 290, 297–98 (Tex. App.—Dallas 2006, no pet.). Johnson and Amegy had a contractual relationship; there is no evidence that a special trust or a fiduciary relationship existed between them. There is also no sufficient showing of actual fraud that could justify a constructive trust. To prove fraud, a plaintiff must show that the defendant made "(1) a material misrepresentation, (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) which was intended to be acted upon, (4) which was relied upon, and (5) which caused injury." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). The record suggests two misrepresentations by Johnson when he obtained the $15 million loan from Amegy: the statement in the security agreement that the partnership units were unencumbered and the statement in the April 24, 2008 letter that Johnson would pay 50% of the loan balance if he sold the units. But on the current record, the first statement was not a material misrepresentation because the SunTrust agreement not to encumber the partnership units did not grant SunTrust a security interest in the units. As to the second statement, there is no evidence Johnson knew his statement was false at the time he made it. The record does not present a basis to impose a constructive trust or to find irreparable harm, as needed to justify the injunction Amegy seeks.[4]

## III.    Conclusion

Amegy is understandably concerned about recovering the outstanding principal and interest due under the promissory note. Johnson has sold assets worth approximately $9.5 million he

---

[4]    Johnson argues that this court cannot issue an injunction freezing assets because Amegy has not shown a sufficient nexus between the assets sought to be frozen and its equitable claims. (Docket Entry No. 29, at 3–4). *See In re Fredeman Litigation*, 843 F.2d 821, 827 (5th Cir. 1988) (stating that an injunction "limited to the property in dispute or its direct, traceable proceeds, is far different from [an] all-inclusive" injunction freezing all of the defendant's assets). Because Amegy has made an insufficient showing of likely irreparable harm, there is no need to address this argument.

represented were pledged as security for the Amegy loan. But a preliminary injunction freezing Johnson's assets is an extraordinary remedy available only if Amegy proves that irreparable harm is not merely possible, but likely, in the absence of an injunction.  The current record reveals that Johnson owns substantial assets sufficient to satisfy a final judgment for Amegy.  Amegy has not shown a reasonable likelihood that, at the time final judgment is entered, Johnson's equity in his assets will be less than the amount Amegy seeks to recover under the promissory note.  The motion for a preliminary injunction is denied.

SIGNED on October 18, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge