**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AMEGY BANK NATIONAL ASSOCIATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-3218 |
| | § | |
| MONARCH FLIGHT II, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This dispute arises out of a $15 million loan made by the plaintiff, Amegy Bank National Association. Amegy sued Monarch Flight II, LLC ("Monarch"), the borrower, and William B. Johnson, the guarantor, after Monarch defaulted. Amegy also sued John T. Bobo, an attorney who represented Monarch and Johnson in connection with the Amegy loan; Bobo's law firm, Bobo, Hunt, White & Nance; Host Hotels & Resorts L.P., an entity in which Johnson owned partnership units that were pledged as collateral for the loan; and Host Hotels & Resorts, Inc., a corporation whose shares Johnson would receive if he chose to redeem his partnership units in Host Hotels & Resorts L.P. Amegy alleged the right to recover the outstanding principal and interest, as well as attorneys' fees. Amegy applied for a preliminary injunction, seeking to freeze assets owned by Johnson to ensure that sufficient assets will be available to satisfy a judgment. After an evidentiary hearing on the application for a preliminary injunction, this court denied the motion for a preliminary injunction. Amegy has moved for reconsideration. (Docket Entry No. 40). Johnson has filed a response. (Docket Entry No. 54). This court concludes that Amegy has made the showing

needed for reconsideration and, based on the record[1] and the applicable law, grants the motion for a preliminary injunction.[2] The reasons for this ruling are explained below.

## I.     Background

Johnson is the sole owner and managing member of Monarch. In 2008, Monarch borrowed $15 million from Amegy. The loan was documented by a May 1 promissory note executed by Johnson as managing member of Monarch. Monarch was required to make monthly interest payments from July 1, 2008 until May 1, 2011, when all outstanding principal and accrued interest became due. (Docket Entry 1-1, at 1). The $15 million was to be used to finance the purchase, repair, and upgrade of a Gulfstream Aerospace GIII Jet; to finance the development of Orchid Bay, a real estate development project in the Bahamas; and "for any other Borrower or Guarantor purpose." (*Id.*, at 6).

Amegy also entered into a guarantee agreement with Johnson and two security agreements, one with Johnson and one with Monarch. In the guarantee agreement, Johnson agreed to assume Monarch's obligations under the note if Monarch defaulted. (Docket Entry No. 1-2). The two security agreements pledged collateral to secure Amegy's loan. The first security agreement—between Amegy and Monarch—granted Amegy a security interest in the GIII Jet. (Docket Entry No. 1-4). The second security agreement—between Johnson and Amegy—granted Amegy a security interest in 825,457 Host Hotels & Resorts, L.P. partnership units that Johnson

---

[1] The evidentiary record has been supplemented since the preliminary injunction hearing. As supplemented, the record now includes a property list provided by Johnson to Amegy that lists three properties along with the outstanding loans associated with each property, (Docket Entry No. 40-3); a *lis pendens* notice recorded for one of the three properties on Johnson's list, (Docket Entry No 40-1); and county tax records listing the value of Waterfall Farms, another property on the list, as $4,865,500, (Docket Entry No. 40-2).

[2] Amegy has also filed a motion for expedited consideration of the motion for reconsideration. (Docket Entry No. 41). This motion is denied as moot.

2

personally owned and in any shares of Host Hotels & Resorts, Inc. that Johnson would own as a result of redeeming the partnership units. (Docket Entry No. 1-3). In this agreement, Johnson represented and warranted that he owned the partnership units "free and clear of any lien, security interest, pledge, claim, or other encumbrance . . . or any right or option on the part of a third person to purchase or otherwise acquire" them. (*Id.*, at 3). Amegy filed UCC-1 financing statements to perfect its security interests in the aircraft and partnership units. (Docket Entry No. 1-6; Docket Entry No. 1-7). It is unclear whether the filing of a UCC-1 financing statement was sufficient, by itself, to perfect Amegy's security interest in the partnership units.

On April 24, 2008—one week before signing the second security agreement—Johnson sent Amegy a letter that stated, in relevant part:

> I have attached the Host Hotels & Resorts, L.P. written confirmation dated January 15, 2008 showing 825,457 partnership units. These particular units can be converted to stock at any time and sold. I prefer to keep them as partnership units at the present time . . . . I will agree that when I dispose of this particular portion of my Host Hotels & Resorts, L.P. units, I will be happy to pay down 50% of the balance of the $15 million dollar loan that I will have with you.

(Docket Entry No. 1-10, at 2). The agreement granting Amegy a security interest in the partnership units did not specify that Johnson could dispose of the units if he paid 50% of the balance of the loan. Instead, the agreement stated that Johnson would not "sell, assign, convey, pledge or otherwise dispose" of the units and shares without Amegy's "prior written consent." (Docket Entry No. 1-3, at 4).

Johnson had previously entered into an agreement with SunTrust Bank relating to the same partnership units pledged to Amegy. In October 2006, Johnson obtained an $8 million loan from SunTrust and signed a promissory note and an agreement not to encumber assets. Under the latter

agreement, Johnson agreed not to "transfer, create, incur, assume or suffer to exist any pledge, mortgage, trust, lien, security interest, assignment or other preferential arrangement, charge or encumbrance . . . upon or with respect to" the 825,457 Host Hotels partnership units. (Inj. Hr'g, Pl.'s Ex. 16C). Johnson renewed the SunTrust loan several times, for different amounts. In May 2010, Johnson signed an agreement with SunTrust in which he represented that the October 2006 agreement not to encumber the Host Hotel partnership units "remains in full force and effect and no default exists thereunder" and promised to "submit to SunTrust to apply against the loan . . . all proceeds received from either the sale or transfer" of the partnership units. (*Id.*, Pl.'s Ex. 16A). In May 2008, when Amegy made the $15 million loan to Monarch, Johnson did not disclose to Amegy the existence of the SunTrust agreement not to encumber the partnership units. Amegy learned about this agreement when SunTrust sued Johnson in June 2011 after he defaulted on the SunTrust promissory note. SunTrust sued to recover the unpaid interest and principal, which at that time were $9,062,360.93. (*Id.*).

On December 31, 2009—after Monarch made some late interest payments on the Amegy loan and after Amegy requested a 50% prepayment of the principal under section 6(b) of the promissory note—Bobo sent Amegy a letter confirming that Johnson had 825,457 partnership units in Host Hotels, that the units were pledged to Amegy, and that they had a value of $9,666,101.44. (Docket Entry No. 1-8, at 1). Five days later, Johnson sent Host Hotels a notice exercising his right to redeem the partnership units. In the notice, Johnson stated as follows:

> the undersigned (a) has marketable and unencumbered title to such Units, free and clear of the rights of or interests of any other person or entity, (b) has the full right, power and authority to redeem and surrender such Units as provided herein and (c) has obtained the consent or approval of all persons or entities, if any, having the right to consult or approve such redemption and surrender.

4

(Docket Entry No. 1-9, at 2).

Johnson's financial records indicate that he sold 843,199 units in Host Hotels for $9,516,052.12 on January 26, 2010.[3] (Inj. Hr'g, Pl.'s Ex. 20). By September 2010, Johnson had used most of the loan proceeds on personal and business expenses and had used most of the partnership sale proceeds to benefit and improve real property he owned that was not pledged to secure the Amegy loan. (*Id.*, Ex. 22). Johnson did not inform Amegy that he was selling his partnership units. Nor did he pay 50% of the loan balance, as stated in the April 24, 2008 letter to Amegy.[4]

Under the Amegy promissory note, Monarch was required to make monthly interest payments by the first day of each month from July 1, 2008 to May 1, 2011. The note defined "Event of Default" to include Monarch's failure "to pay this Note or any installment of this Note (whether principal or interest) when due." (Docket Entry No. 1-1, at 3). Monarch made its first late interest payment in October 2008. It continued to make interest payments—some late and some on time—until January 21, 2011, when it paid the monthly interest for November 2010. The November 2010 interest payment was the last Monarch made to Amegy under the promissory note. Monarch did not pay the outstanding principal and accrued interest when the note matured on May 1, 2011. Amegy attempted to foreclose on the collateral securing its loan: the aircraft and the hotel partnership units. Amegy was unable to foreclose on the partnership units because Johnson had sold them in January 2010. On September 2, 2011—three days after Amegy brought this

---

[3] The record does not explain the discrepancy between the number of units Johnson redeemed and the number of units Johnson sold.

[4] According to Amegy, it did not learn that Johnson disposed of his units until August 2011, when Amegy contacted Host Hotels to obtain information about foreclosing on the units. (Docket Entry No. 1, at 18–19).

action—Monarch filed for Chapter 11 bankruptcy. (Docket Entry No. 7-1). Because the aircraft became property of the bankruptcy estate, the Bankruptcy Code's automatic stay provision prevented Amegy from foreclosing on the aircraft.

At the injunction hearing, Johnson testified that he currently owns—either individually, together with his wife, or through his various business entities—several significant assets. These include the Waterfall Farms in Shelbyville, Tennessee, and Orchid Bay, a real estate development in the Bahamas. Johnson testified that his wife and he own the Tennessee horse farm. According to Johnson, the farm was appraised at approximately $130 to $140 million. Johnson testified that he believes the appraisal was too high and estimated that the current value of the farm is between $75 and $125 million dollars. Johnson testified that he plans to "give all that"—the farm and the horses—to the veterinary school at the University of Tennessee "at a point in time," but no legal commitment with the university currently exists. Deutsche Bank has a lien on the farm for $7 million. The 2011 county tax records for the farm value it at approximately $4.86 million, far less than the estimate Johnson provided.

Johnson testified that the value of the real estate development in the Bahamas is several hundred million dollars. The Royal Bank of Canada has a $1 million lien on the property. Johnson owns 100% of a domestic corporation that owns 100% of a Bahamas corporation that owns Orchid Bay. Johnson testified that he is currently trying to borrow $200 million—not the far lower amount this court erroneously understood Johnson was seeking—to complete the development. Johnson did not specify what assets will be pledged as security for the loan he is working to obtain. The record showed that there are only 17 to 18 undeveloped lots remaining in phase 1, which are worth approximately $47 million when they sell, which is unlikely to occur in the next few years, given

the market conditions. The remaining salable land is part of phase 2, which cannot be developed until Johnson obtains the additional financing and builds an inland canal and other infrastructure. No units will be sold for many years.

The record shows that Johnson is currently in default on loans not secured by his real property. These include the $15 million loan from Amegy, a $8.95 million loan from SunTrust, and a $5 million loan from Synovus Bank.

On August 30, 2011, Amegy filed this action to recover the outstanding principal and accrued interest due under the promissory note. Amegy's complaint asserts five causes of action against Johnson: breach of contract; conversion; fraud; money had and received; and conspiracy.[5] (Docket Entry No. 1, at 20–23). In addition to damages, Amegy seeks three equitable remedies: restitution; an accounting "for all benefits derived by Johnson . . . by virtue of [his] wrongful conduct"; and the "[i]mposition of a constructive trust upon all money, property, assets, or other benefits, and upon all property . . . acquired with the money derived by Johnson . . . pursuant to the $15 million loan from Amegy, and from money Johnson wrongfully retained when he converted and sold the partnership units." (*Id.*, at 26). After filing its complaint, Amegy applied for a preliminary injunction, (Docket Entry No. 4), and filed a supplement to that application, (Docket Entry No. 7). Amegy asks this court to freeze three types of assets: (1) all of Johnson's assets; (2) all assets that, according to Amegy, are subject to a constructive trust; and (3) "all assets belonging to or in the possession of . . . Johnson or subject to his control having a current total value, net of any lien or encumbrances, of $16,000,000." (Docket Entry No. 7, at 7). Amegy argues that without an injunction, it "will be injured because Johnson will have insufficient assets remaining to satisfy a

---

[5] Amegy's first amended complaint, filed on October 11, 2011, adds causes of action for theft and fraudulent transfers. (Docket Entry No. 33, at 35–36).

money judgment" on its claims. (*Id.*, at 4). Amegy contends that "Johnson has already . . . transferred assets in which Amegy had a security interest"—the partnership units—"in order to place the [units] beyond Amegy's reach." (*Id.*, at 3–4). At the injunction hearing, Johnson responded that Amegy has an adequate remedy at law in the form of money damages, because Johnson and the various business entities he controls own assets worth well in excess of $15 million.

## II.   Analysis

Amegy asks this court to reconsider its prior ruling denying the motion for a preliminary injunction. That ruling was primarily based on the erroneous belief that Johnson testified at the injunction hearing that he was planning to borrow $28 million dollars to complete the Orchid Bay development. The motion for reconsideration correctly points out that the correct amount is $200 million. Based on the clarified and expanded record, this court concludes that Amegy has shown irreparable harm, which is the only issue the parties disputed in the preliminary injunction hearing, and grants Amegy's motion for reconsideration.

The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration. *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 (5th Cir. 2004); *see also St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 339 (5th Cir. 1997). Reconsideration motions are generally analyzed under the standards for a motion to alter or amend judgment under Rule 59(e) or a motion for relief from a judgment or order under Rule 60(b). *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998). Rule 59(e) governs when the reconsideration motion is filed within 28 days of the challenged order or when the motion seeks reconsideration of an interlocutory order. *Steadfast Ins. Co. v. SMX 98, Inc.*, No. H–06–2736, 2009 WL 3190452, at *4–5 (S.D. Tex. Sept. 28, 2009) (drawing the line at 10 days instead of 28 days

because the case was decided before the amendments to Rule 59 took effect on December 1, 2009). Rule 59(e) applies, because this court has not entered judgment.

A motion to alter or amend under Rule 59(e) "'must clearly establish either a manifest error of law or fact or must present newly discovered evidence' and 'cannot be used to raise arguments which could, and should, have been made before the judgment issued.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). The Fifth Circuit warns that reconsideration under Rule 59(e) is an extraordinary remedy that courts should use sparingly. *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004).

To obtain a preliminary injunction, Amegy must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Planned Parenthood of Houston & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (internal quotation marks and citation omitted).

Johnson stipulated for the purpose of the injunction hearing that Amegy will likely succeed on the merits of its claims, including its claim that Johnson is liable for all amounts due under the promissory note as a guarantor of that note. The parties assumed, for the injunction hearing only, that Amegy had met its burden of showing a substantial likelihood of success on the merits. The parties disputed only whether Amegy could show that it will suffer irreparable harm if this court

does not issue an injunction freezing the assets it identified. The only issue is irreparable harm. To the extent this court based its prior opinion on a finding that Amegy had not sufficiently shown a special trust or fiduciary relationship, or fraud, to justify a constructive trust, that was erroneous. The parties stipulated that Amegy had shown the necessary likelihood of success on the merits and that the only issue was irreparable harm.

The record as supplemented and without this court's erroneous belief that Johnson was seeking to borrow far less than $200 million shows that Amegy will suffer irreparable harm unless injunctive relief is granted. Showing irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1, at 139 (2D ED. 1995). "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). "However, the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Janvey*, 647 F.3d at 600. Even when, as here, the ultimate relief sought is money damages, "extraordinary circumstances"—such as evidence showing that the defendant is likely to become insolvent before final judgment or that the defendant intends to dissipate his assets to make a judgment awarding damages uncollectible—"may give rise to the irreparable harm required for a preliminary injunction." *Hughes Network*, 17 F.3d at 694; *see also Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 86–87 (2d Cir. 1996). The Supreme Court has emphasized that "plaintiffs seeking preliminary relief [must]

demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*

On the current record, Amegy has shown that it is likely that Johnson will lack sufficient assets at the end of the litigation to satisfy a final judgment awarding damages. Johnson testified that he owns 100% of Waterfall Farms, a 1050-acre farm in Tennessee where he conducts a horse-breeding operation. Johnson estimated that the current value of the property is between $75 and $125 million and that there is a $7 million lien on the farm securing a Deutsche Bank loan. Amegy objected to Johnson's testimony about the value of the property and has presented evidence in the form of the tax records showing that the property is worth far less than Johnson's estimate. The record shows that Johnson's equity in this asset is less than the value of the outstanding bank loans that are currently due and that Johnson is responsible for. And if Johnson further encumbers this property and other property by $200 million—the amount he is trying to borrow to complete the real estate development in the Bahamas—Johnson's equity in the assets shown in the record (not just Waterfall Farms) will be less than needed to satisfy a money judgment for Amegy.

On the basis of the expanded record, Amegy's motion for injunctive relief is granted. Amegy has shown a reasonable likelihood that, at the end of the litigation, Johnson's equity in his assets will be far less than the amount Amegy seeks to recover under the promissory note.

Johnson argues that this court cannot issue an injunction freezing assets because Amegy has not shown a sufficient nexus between the assets sought to be frozen and its equitable claims.

(Docket Entry No. 29, at 3–4). *See In re Fredeman Litigation*, 843 F.2d 821, 827 (5th Cir. 1988) (stating that an injunction "limited to the property in dispute or its direct, traceable proceeds, is far different from [an] all-inclusive" injunction freezing all of the defendant's assets). Amegy has shown how Johnson used the $9.5 million in proceeds from the sale of the partnership units. The evidence shows that Johnson used the money to improve and benefit the following real properties: (1) his home at 1035 Spyglass Lane in Naples, Florida; (2) property he owns or co-owns with his wife at 355 River Bend Road in Shelbyville, Tennessee; (3) Waterfall Farms; (4) the Orchid Bay development in the Bahamas; (5) property he co-owns in Shelbyville, Tennessee known as Airport Business Park; and (6) property he owns or co-owns known as 100 West Paces Ferry Road NW in Atlanta, Georgia. Johnson's bank records further indicate that he used part of the $9.5 million to pay down loans on some or all of these properties. For example, Johnson paid approximately $2 million to Deutsche Bank and North American Savings Bank, which have loans on Johnson's home in Florida, the 100 West Paces Ferry Road property, and Waterfall Farms.

Amegy has shown that it is entitled to a preliminary injunction freezing the real properties that Johnson has improved or benefitted using the proceeds of the partnership units sale. The injunction will prevent Johnson from transferring, selling, or further encumbering them.[6]

### III. Conclusion

---

[6] After Amegy moved for a preliminary injunction, Johnson filed a motion to dismiss the complaint and compel arbitration. (Docket Entry No. 21). The motion argued that Amegy and Johnson entered into an agreement to arbitrate any dispute related to the $15 million Amegy loan. Amegy has not responded to the motion. Under Fifth Circuit precedent, a district court may issue injunctive relief to protect the status quo pending resolution of a motion to compel arbitration. *Janvey*, 647 F.3d at 595.

Amegy's motion for reconsideration is granted. Johnson is prohibited from transferring, selling, or further encumbering the real properties he has improved or benefitted using the proceeds of the partnership units sale. A preliminary injunction order is separately entered.

SIGNED on December 7, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge