IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| AMEGY BANK NATIONAL ASSOCIATION,§ | |
| § | |
| Plaintiff, § | |
| § | |
| v.  § | CIVIL ACTION NO. 4:11-CV-3218 |
| § | |
| MONARCH FLIGHT II, LLC, *et al.*, § | |
| § | |
| Defendants. § | |

**MEMORANDUM AND ORDER**

This dispute arises out of a $15 million loan made by the plaintiff, Amegy Bank National Association. Amegy sued Monarch Flight II, LLC ("Monarch"), the borrower, and William B. Johnson ("Johnson"), the guarantor, after Monarch defaulted. Amegy also sued John T. Bobo, an attorney who represented Monarch and Johnson in connection with the Amegy loan; Bobo's law firm, Bobo, Hunt, White & Nance; Host Hotels & Resorts L.P., an entity in which Johnson owned partnership units that were pledged as collateral for the loan; Host Hotels & Resorts, Inc., a corporation whose shares Johnson would receive if he chose to redeem his partnership units in Host Hotels & Resorts L.P; Sandra T. Johnson, Johnson's wife; and five business entities Johnson owns or controls (the "Johnson entities").[1] Amegy alleges the right to recover the outstanding principal and interest, as well as attorneys' fees, under numerous causes of action, including fraud, conversion, money had and received, breach of contract, conspiracy, theft, and fraudulent transfers.

Monarch, Johnson, Johnson's wife, and the Johnson entities (the "moving defendants") have moved to dismiss in favor of arbitration and to compel arbitration. (Docket Entries No. 21, 66 &

---

[1] The Johnson entities are W.B. Johnson International, L.L.C.; W.B. Johnson Investment Co.; Waterfall, L.P.; Waterfall Farms, Inc.; and Sandra and William B. Johnson Foundation, Inc.

72.) The motions argue that Amegy's claims are subject to an arbitration agreement among Amegy, Johnson, and Monarch. That agreement provides for binding arbitration of disputes "in any way arising out of, pertaining to or in connection with" the $15 million loan or underlying documents. (Docket Entry No. 21-1, at 2.) Amegy has responded to the motions. (Docket Entries No. 75 & 90.) Amegy argues that because the arbitration agreement excludes injunctive-relief claims from arbitration and because it seeks permanent injunctive relief, compelling arbitration on the damages claims would be inefficient because the parties would simultaneously litigate the same issues in two fora. Amegy also argues that Johnson's wife and the Johnson entities cannot compel arbitration because they were not parties to the arbitration agreement.

The court heard argument on the motions. Based on the pleadings; the motions and responses; the arguments of counsel; and the relevant law, this court grants the motions to compel arbitration and stays this action as to the moving defendants pending the arbitration. A hearing on Amegy's motion for contempt, (Docket Entry No. 86), and a status conference as to the claims against the Bobo defendants are set for **May 11, 2012 at 2:30 p.m.**

The reasons for these rulings are explained below.

I.  **Background**[2]

Johnson is the sole owner and managing member of Monarch. In 2008, Monarch borrowed $15 million from Amegy. The loan was documented by a May 1 promissory note executed by Johnson as managing member of Monarch. Monarch was required to make monthly interest payments from July 1, 2008 until May 1, 2011, when all outstanding principal and accrued interest became due. (Docket Entry 33-1, at 1.) The $15 million was to be used to finance the purchase,

---

[2] The background facts are drawn from the factual allegations of the first amended complaint, which this court must accept as true, from the numerous exhibits attached to the complaint, and from the arbitration agreement attached to the motions to dismiss.

repair, and upgrade of a Gulfstream Aerospace GIII Jet; to finance the development of Orchid Bay, a real-estate development project in the Bahamas; and "for any other Borrower or Guarantor purpose." (*Id.* at 6.)

When Monarch executed the promissory note, Amegy entered into a guarantee agreement with Johnson and two security agreements, one with Johnson and one with Monarch. In the guarantee agreement, Johnson agreed to assume Monarch's obligations under the note if Monarch defaulted. (Docket Entry No. 33-2, at 1.) The two security agreements pledged collateral to secure Amegy's loan. The first security agreement—between Amegy and Monarch—granted Amegy a security interest in the GIII Jet. (Docket Entry No. 33-4, at 1.) The second security agreement—between Johnson and Amegy—granted Amegy a security interest in 825,457 Host Hotels & Resorts, L.P. partnership units that Johnson personally owned and in any shares of Host Hotels & Resorts, Inc. that Johnson would own as a result of redeeming the partnership units. (Docket Entry No. 33-3, at 1–2.) The agreement stated that Johnson would not "sell, assign, convey, pledge or otherwise dispose" of the units and shares without Amegy's "prior written consent." (*Id.* at 4.)

Johnson and Monarch also entered into an arbitration agreement with Amegy. The arbitration agreement's "Binding Arbitration" clause stated, in relevant part:

> Notwithstanding any provision in any Documents (defined below) to the contrary, upon the request of any of the undersigned . . . whether made before or after the institution of any legal proceeding, any action, dispute, claim or controversy of any kind (for example, whether in contract or in tort, under statutory or common law, or legal or equitable) now existing or hereafter arising between or among the parties in any way arising out of, pertaining to or in connection with (1) the referenced Loan, any related agreements, documents, or instruments (collectively, "Documents") or any transaction contemplated thereby, before or after maturity, or (2) any aspect of the past or present relationships of the parties to the loan

3

>Documents shall be resolved by mandatory and binding arbitration in accordance with the terms of this Arbitration Agreement.

(Docket Entry No. 21-1, at 2.) The agreement's "Preservation of Remedies" clause stated that "[n]o provision of, nor the exercise of any rights under, this Arbitration Agreement shall limit the right of any party to employ other remedies, including . . . obtaining provisional or ancillary remedies such as . . . injunctive relief, sequestration, attachment, garnishment, or the appointment of a receiver from a court having jurisdiction before, during, or after the pendency of any arbitration." (*Id.* at 3.) The clause also stated that "[t]he institution and maintenance of an action for judicial relief, pursuit of provisional or ancillary remedies, or exercise of self-help remedies shall not constitute a waiver of the right of any party . . . to submit any Dispute to arbitration nor render inapplicable the compulsory arbitration provisions hereof." (*Id.*)  Neither Johnson's wife nor the Johnson entities signed the arbitration agreement.

In December 2009—after Monarch made some late interest payments on the Amegy loan and after Amegy requested a 50% prepayment of the principal under section 6(b) of the promissory note—Bobo sent Amegy a letter confirming that Johnson had 825,457 partnership units in Host Hotels, that the units were pledged to Amegy, and that they had a value of $9,666,101.44. (Docket Entry No. 33-8, at 1.)  Five days later, Johnson sent Host Hotels a notice exercising his right to redeem the partnership units. In the notice, Johnson stated as follows:

>the undersigned (a) has marketable and unencumbered title to such Units, free and clear of the rights of or interests of any other person or entity, (b) has the full right, power and authority to redeem and surrender such Units as provided herein and (c) has obtained the consent or approval of all persons or entities, if any, having the right to consult or approve such redemption and surrender.

(Docket Entry No. 33-9, at 2.)

4

Johnson did not inform Amegy that he was redeeming his Host Hotels partnership units. In January 2010, Johnson sold the redeemed units for $9,516,052.12. (Docket Entry No. 33-27, at 9.) By November 2010, Johnson spent the sale proceeds on personal and business expenses. (Docket Entry No. 33, at 25–26.) Amegy did not learn about the sale until August 2011, when it contacted Host Hotels to obtain information about foreclosing on Johnson's partnership units. (*Id.* at 22.)

Under the Amegy promissory note, Monarch was required to make monthly interest payments by the first day of each month from July 1, 2008 to May 1, 2011. The note defined an "Event of Default" to include Monarch's failure "to pay this Note or any installment of this Note (whether principal or interest) when due." (Docket Entry No. 33-1, at 3.) Monarch made its first late interest payment in October 2008. Monarch continued to make interest payments—some late and some on time—until January 21, 2011, when it paid the monthly interest for November 2010. The November 2010 interest payment was the last Monarch made to Amegy under the promissory note. Monarch did not pay the outstanding principal and accrued interest when the note matured on May 1, 2011.

After Monarch defaulted, Amegy attempted to foreclose on the collateral securing its loan: the aircraft and the hotel partnership units. Amegy was unable to foreclose on the partnership units because Johnson had sold them in January 2010. On September 2, 2011—three days after Amegy brought this action—Monarch filed for Chapter 11 bankruptcy. (Docket Entry No. 7-1.) Because the aircraft became property of the bankruptcy estate, the Bankruptcy Code's automatic stay provision prevented Amegy from foreclosing on this collateral.

On August 30, 2011, Amegy filed this action to recover the outstanding principal and accrued interest due under the promissory note. Amegy's first amended complaint asserts causes

of action for: (1) fraud, conversion, money had and received, breach of contract, conspiracy, theft, and fraudulent transfer against Johnson; (2) breach of contract, conspiracy, theft, and fraudulent transfer against Monarch; and (3) conspiracy and fraudulent transfer against Johnson's wife and the Johnson entities. (Docket Entry No. 33, at 29–36.) These causes of action are based on Johnson's alleged breach of the guarantee agreement, Monarch's default under the promissory note, or Johnson's sale of the partnership units without Amegy's consent and in violation of the security agreement. In addition to money damages, Amegy seeks three equitable remedies: restitution; an accounting "of all money, assets, and benefits" the defendants received "as a result of the[ir] wrongful conduct"; and a constructive trust "upon the monies wrongfully gained" by the defendants, including the money "obtained from the retention of the proceeds from the conversion and sale of the partnership units." (*Id.* at 34.)

Monarch, Johnson, Johnson's wife, and the Johnson entities have moved to dismiss and to compel arbitration. Monarch and Johnson argue that because the claims against them relate to the $15 million loan and underlying documents, the claims are subject to mandatory arbitration under the arbitration agreement. (Docket Entry No. 21, at 1–4.) Johnson's wife and the Johnson entities argue that because the claims against them are "derivative of the claims against Johnson," the claims are subject to arbitration even though they did not sign an agreement containing an arbitration clause. (Docket Entry No. 66-2, at 16.) Amegy responds that compelling arbitration on the money-damage claims would be inefficient and lead to duplicative litigation because the arbitration agreement excludes injunctive-relief claims from arbitration. Amegy also contends that the claims against Johnson's wife and the Johnson entities are not subject to arbitration because those defendants were not parties to the arbitration agreement.

The parties' arguments are analyzed in detail below.

## II.   The Legal Standard

The Federal Arbitration Act ("FAA") permits an aggrieved party to file a motion to compel arbitration when an opposing "party has failed, neglected, or refused to comply with an arbitration agreement." *Am. Bankers Ins. Co. of Fla. v. Inman*, 436 F.3d 490, 493 (5th Cir. 2006) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)); *see also* 9 U.S.C. § 4. FAA Section 4 provides that, when a party petitions the court to compel arbitration under a written arbitration agreement, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4. The FAA "leaves no place" for the court to exercise discretion. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). The court must direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. *Id.* Agreements to arbitrate must be enforced, absent a ground for revoking the contractual agreement. *Id.*

In considering a motion to compel arbitration under the FAA, a court first determines whether the parties agreed to arbitrate the dispute in question. That inquiry consists of two separate determinations: "'(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.'" *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006) (citation omitted). In determining whether the parties agreed to arbitrate, the court applies state law governing contract formation. *First Options v. Kaplan*, 514 U.S. 938, 944 (1995). If there is a binding agreement to arbitrate, the court then decides whether the dispute is within the scope of that agreement. The FAA "expresses a strong

national policy favoring arbitration of disputes, and all doubts concerning the arbitrability of claims should be resolved in favor of arbitration." *Wash. Mut. Fin. Grp., L.L.C. v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004) (quotations omitted); *see also EEOC v. Waffle House, Inc.*, 534, U.S. 279, 294 (2002). The duty to arbitrate remains one of contract; a court cannot compel parties to arbitrate issues they have not agreed to submit. *See Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) ("A party cannot be compelled to submit a dispute to arbitration unless there has been a contractual agreement to do so.")).

In this case, the parties do not dispute that Amegy, Johnson, and Monarch agreed to arbitrate. The issues are whether their agreement extends to all the claims in dispute and whether nonsignatories can also compel Amegy to arbitrate the claims against them.

### III. Analysis

#### A. Whether the Claims Against Johnson and Monarch Are Subject to Arbitration

Amegy does not dispute that it entered into a binding arbitration agreement with Johnson and Monarch or that the monetary claims against Johnson and Monarch are covered by that agreement. Instead, Amegy argues that compelling arbitration on those claims will lead to duplicative litigation before separate tribunals. Amegy's argument is based on its request for a permanent injunction that Amegy included in its original complaint but not in its first amended complaint. According to Amegy, the arbitration agreement's "Preservation of Remedies" clause excludes claims for injunctive relief from arbitration.[3] Because determining whether Amegy is entitled to a permanent injunction requires litigating the underlying monetary claims that form the basis for the injunctive relief sought, Amegy contends that simultaneously litigating the monetary claims in arbitration and

---

[3] That clause states, in relevant part, that "[n]o provision of, nor . . . exercise of any rights under, this Arbitration Agreement shall limit the right of any party to employ other remedies, including . . . injunctive relief . . . from a court having jurisdiction before, during, or after the pendency of any arbitration." (Docket Entry No. 21-1, at 3.)

the injunction claim in this court will "force the parties to litigate identical claims in two forums." (Docket Entry No. 90, at 5.) Amegy also argues that the alternative—"postpon[ing] trial on Amegy's claim for injunctive relief until the underlying monetary claims are decided at arbitration"—is "unacceptable" because this court "must expeditiously address and resolve whether permanent injunctive relief is warranted." (*Id.* at 5–6.)

Assuming, without deciding, that the arbitration agreement excluded claims for permanent injunctive relief from arbitration, Amegy's arguments against compelling arbitration are nonetheless unpersuasive. First, Amegy's arguments are premised on the existence of a claim for permanent injunctive relief. Amegy's "Original Complaint and Verified Application for Injunctive Relief" asserted a claim for a permanent injunction. But Amegy's first amended complaint did not reassert that claim. An amended complaint "supersedes and replaces an original complaint, 'unless the amendment specifically refers to or adopts the earlier pleading.'" *Eubanks v. Parker Cnty. Comm'rs Court*, No. 94-10087, 1995 WL 10513, at *2 (5th Cir. Jan. 3, 1995) (citation omitted). Because Amegy did not reassert the permanent-injunction claim in the first amended complaint and because the amended complaint does not refer to or incorporate the original pleading, there is no permanent-injunction claim currently pending in this litigation. *See Moore v. Melvin*, No. 94-60042, 1994 WL 708686, at *4 n.8 (5th Cir. Dec. 7, 1994) ("Moore's amended complaint replaces the original. We, therefore, do not consider [Moore's] prior allegations."); *Fullerton v. Maynard*, No. 91-7002, 1991 WL 166400, at *2 (10th Cir. Aug. 29, 1991) (holding that the plaintiff abandoned claims asserted in an earlier pleading by failing to reassert those claims in a subsequent pleading); *Corelleone v. Grounds*, No. C 11–4338 PJH (PR), 2012 WL 1196082, at *2 (N.D. Cal. Apr. 10, 2012) ("Because an amended complaint completely replaces the original complaint, plaintiff must include in it all the claims he wishes to present.").

Second, even assuming that Amegy asserted a permanent-injunction claim that was excluded from arbitration, the prospect of litigating similar claims before different tribunals does not grant district courts discretion to deny a motion to compel arbitration of the arbitrable claims. The Supreme Court has held that efficiency concerns cannot override the FAA's command "that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*, 470 U.S. at 218 (citations omitted). The FAA "requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possible inefficient maintenance of separate proceedings in different forums." *Id.* at 217. "The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that [courts] rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute." *Id.* at 221.

To the extent *Harvard Property Trust, LLC v. Cardillo*[4]—the case Amegy primarily relies on—suggests that courts may deny motions to compel arbitration in cases with overlapping nonarbitrable claims, *Harvard Property* is inconsistent with *Dean Witter*. *Dean Witter* controls the outcome of this case. Under *Dean Witter*, the claims asserted against Johnson and Monarch in the first amended complaint must be arbitrated.

This result is consistent with *Thompson v. Irwin Home Equity Corp.*, 300 F.3d 88 (1st Cir. 2002). In *Thompson*, the plaintiffs obtained a mortgage loan from the defendant that was subject to the provisions of the Truth in Lending Act ("TILA"). Several months later, the plaintiffs sued alleging that the lender "had violated TILA by failing to notify them of their right to rescind, as

---

[4] *Harvard Property Trust, LLC v. Cardillo*, No. 3:10–CV–1844–K, 2011 WL 1792866 (N.D. Tex. May 6, 2011).

10

required by 15 U.S.C. § 1635(a)." *Id.* at 89. "Their complaint [sought] rescission of the loan agreement and damages." *Id.* at 90. After the lender moved to compel arbitration under an arbitration clause in the loan agreement, the district court granted the motion and dismissed the case. On appeal, the plaintiffs "point[ed] to the following language in the arbitration agreement" as a ground "for avoiding arbitration":

> Nothing contained in this Alternative Dispute Resolution provision shall limit the right of any party to this Agreement to exercise self-help remedies such as setoff or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, after, or during the pendency of any arbitration or other proceeding. The exercise of a remedy does not waive the right of either party to resort to arbitration.

*Id.* The plaintiffs argued that rescission was "a 'self-help' remedy under TILA, and [was] therefore not subject to arbitration." *Id.* Rejecting the plaintiffs' argument, the First Circuit emphasized that "[t]he loan agreement provide[d] that '[t]he exercise of a remedy does not waive the right of either party to resort to arbitration.' Given this clear language, the [plaintiffs'] attempt to exercise their right to rescind [did] not affect [the lender's] right to have an arbitrator decide whether there [were] indeed grounds for rescission." *Id.* at 91. Even assuming that rescission of the loan agreement under TILA was a self-help remedy, the court explained that "the same cannot be said of [the plaintiffs'] subsequent commencement of litigation in federal district court challenging [the lender's] refusal to cooperate with their attempt at self-help. That litigation [was] unmistakably governed by the arbitration clause." *Id.*

Like the agreement at issue *Thompson*, the arbitration agreement in this case stated that the "pursuit of provisional or ancillary remedies . . . shall not constitute a waiver of the right of any party . . . to submit any Dispute to arbitration nor render inapplicable the compulsory arbitration provisions hereof." (Docket Entry No. 21-1, at 3.) Given this clear language, any claim by Amegy

11

for permanent injunctive relief—assuming, again, that such a claim is excluded from arbitration—would not affect Johnson's and Monarch's rights to compel arbitration of arbitrable claims.

The claims Amegy asserted against Johnson and Monarch in the amended complaint are clearly governed by the agreement's "Binding Arbitration" clause. Johnson's and Monarch's motions to compel arbitration are granted.

### B. Whether the Claims Against Johnson's Wife and the Johnson Entities Are Subject to Arbitration

Amegy argues that the conspiracy and fraudulent transfer claims against Johnson's wife and the Johnson entities are not subject to arbitration because these defendants are not parties to the agreement containing the arbitration clause. "[A] nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate." *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006). "One such situation exists when the signatory is equitably estopped from arguing that a nonsignatory is not a party to the arbitration clause." *Id.* As the Fifth Circuit explained,

> [e]xisting case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be

> rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)) (emphasis omitted).

The conspiracy claims against Johnson's wife and the Johnson entities are clearly arbitrable under *Grigson* because the claims allege substantially interdependent and concerted misconduct between Johnson and the nonsignatory defendants. Amegy alleged that all defendants colluded and conspired with Johnson "to defraud Amegy, convert its partnership units, and secrete and hide [its] assets." (Docket Entry No. 33, at 32.) The fraudulent transfer claims against the nonsignatory defendants are also arbitrable under *Grigson* because these claims presume the existence of the Johnson-Amegy security agreement, one of the loan documents to which the arbitration agreement applies. Amegy alleged that "[a]s a result of the conduct described" in the amended complaint, Johnson "wrongfully converted and sold all of his interest in his Host Hotels partnership units" and then "disposed of all of the proceeds to third parties and entities," including his wife and the Johnson entities. (*Id.* at 35.) Amegy's allegation that Johnson wrongfully sold the partnership units is premised on the Johnson-Amegy security agreement, which prohibited Johnson from selling the units without Amegy's prior written consent. That agreement was covered by the arbitration agreement containing the arbitration clause.

The nonsignatory defendants' motions to compel arbitration are granted. *See Griffin v. ABN Amro Mortg. Grp. Inc.*, 378 F. App'x 437, 440 (5th Cir. 2010) ("Here, the Griffins' claims against [all defendants] are substantially interdependent, as they all relate to the Griffins' default in terms of payment of the note and deed of trust, and subsequent foreclosure proceedings. Thus, equitable estoppel permitted the district court to compel arbitration proceedings against [the nonsignatory defendants].").

### C. The Effect of Compelling Arbitration on the Preliminary Injunction Entered Against Johnson

Before deciding the motions to compel arbitration, this court entered a preliminary injunction against Johnson. The Fifth Circuit has held that a district court may issue injunctive relief to protect the status quo pending resolution of a motion to compel arbitration. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). But the Fifth Circuit has not yet addressed "whether the commands of the [FAA] require that a federal court immediately divest itself of any power to act to maintain the status quo *once it decides that the case before it is arbitrable*." *Id.* at 594 (quoting *RGI, Inc. v. Tucker & Assocs., Inc.*, 858 F.2d 227, 228–29 (5th Cir. 1988)).

Most circuits that have addressed the issue have held that a district court may enter injunctive relief to preserve the status quo pending arbitration. *See, e.g, Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1052 (2d Cir. 1990); *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 812 (3d Cir. 1989); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir.1986); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1051–54 (4th Cir. 1985). These courts have explained that "[a]rbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." *Blumenthal*, 910 F.2d at 1053 (citations omitted). Only the Eighth Circuit reached a different result. It has held that because "the judicial inquiry requisite to determine the propriety of injunctive relief necessarily would inject the court into the merits of issues more appropriately left to the arbitrator," a "district court errs in granting injunctive relief" in the absence of "qualifying contractual language" providing for or contemplating the injunctive relief sought. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286, 1292 (8th Cir. 1984).

Most district courts in the Fifth Circuit follow the majority position. These courts have characterized this position as the one more consistent with, and necessary to enforce, the FAA.

14

These courts note that the majority view "comports more closely with the purpose of the Arbitration Act to further arbitration as a meaningful dispute resolution mechanism. For arbitration to work, the parties should not be able to continue maneuvering to the disadvantage of each other outside the arbitration model." *Speedee Oil Change Sys., Inc. v. State Street Capital, Inc.*, 727 F. Supp. 289, 292 (E.D. La. 1989). As the First Circuit has explained, "the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process." *Teradyne*, 797 F.2d at 51. But even if this court followed *Hovey*, the result would likely be the same because the arbitration agreement contemplated court-entered injunctive relief pending arbitration. The "Binding Arbitration" clause stated that any "legal or equitable" claim related to the loan or underlying documents must be arbitrated. (Docket Entry No. 21-1, at 2.) But the "Preservation of Remedies" clause qualified this language. The "Preservation of Remedies" clause stated that "[n]o provision of . . . th[e] Arbitration Agreement shall limit the right of any party" to obtain "provisional or ancillary remedies," including injunctive relief, from a court "before, during, or after the pendency of any arbitration." (*Id.* at 3.) As the Fifth Circuit has explained, "*Hovey* leaves open the possibility of a court's entering a preliminary injunction where the parties had contemplated its use beforehand." *RGI*, 858 F.2d at 230.

Because this court may issue a preliminary injunction to preserve the status quo pending arbitration, the preliminary injunction previously entered against Johnson remains in this court despite the order compelling arbitration. The issue is for how long. Some courts refer broadly to a court's authority to issue or maintain injunctive relief extending until the arbitration ends. *See, e.g., Kelly v. Public Utility Dist. No. 2*, No. CV–11–023–JLQ, 2012 WL 1068079, at *6 (E.D. Wash. Mar. 29, 2012) (stating that some injunctions "are tied to the resolution of related proceedings" like

arbitration or mediation); *Arnold Chase Family, LLC v. UBS AG*, No. 3:08cv00581 (MRK), 2008 WL 3089484, at *3 (D. Conn. Aug. 4, 2008) (stating that "at least in the Second Circuit, courts have historically entertained requests for provisional remedies *during the pendency of arbitrations*" (emphasis added)); *Simmons v. Quixtar, Inc.*, No. 4:07cv389, 2007 WL 3256244, at *4 (E.D. Tex. Nov. 5, 2007) (stating that the FAA "does not preclude a court from issuing injunctive relief, including a preliminary injunction, to preserve the status quo *during the process of arbitration*" (emphasis added)). Other courts have held that the authority to issue or maintain a preliminary injunction pending arbitration extends only until an arbitration panel is appointed and can act on applications for such relief. *See Braintree Labs., Inc. v. Citigroup Global Markets Inc.*, 622 F.3d 36, 40 n.4 (1st Cir. 2010) ("A preliminary injunction pending arbitration is ordinarily temporary emergency relief that extends only until the arbitrator itself can decide whether to award relief . . .; and if in this case the arbitration panel could give temporary relief, then any court relief would last until the arbitrator could act on such a request."); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1386 (6th Cir. 1995) (stating that "once the arbitration begins, it is for the arbitrators to decide how to maintain the status quo during the pendency of the arbitration process"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993) (stating that court-entered prearbitration injunctive relief does not extend "ad infinitum," but only until the arbitration panel is able to address whether it should remain in effect). The Fifth Circuit has "reserve[d]" the issue "for another day." *Janvey*, 647 F.3d at 595 n.7.

There is no need to decide whether, as a general rule, a court's authority to issue or maintain injunctive relief pending arbitration extends only until the arbitration panel is in place, or whether that authority extends until the arbitration ends. Arbitration is a matter of contract. *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011). The FAA "does not require parties to arbitrate

16

when they have not agreed to do so, . . . nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (citations omitted). "Because parties are free to structure their arbitration agreements as they see fit, they may limit by contract the issues which they will arbitrate." *Am. Express Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) (citation and internal quotation marks omitted). As discussed above, the arbitration agreement in this case stated that "[n]o provision of, nor the exercise of any rights under, this Arbitration Agreement shall limit the right of any party to employ other remedies, including . . . obtaining provisional or ancillary remedies such as . . . injunctive relief . . . from a court having jurisdiction before, during, or after the pendency of any arbitration." (Docket Entry No. 21-1, at 3.) This provision is clear: the parties intended to allow "a court having jurisdiction"—the United States District Court for the Southern District of Texas—to provide injunctive relief before, during, or after arbitration. Because Johnson, Monarch, and Amegy contemplated court-ordered injunctive relief that extends through arbitration, this court's preliminary injunction will remain in effect until arbitration ends.

## IV. Conclusion

The motions to compel arbitration are granted.[5] Because this court's preliminary injunction will remain in effect during arbitration, this action is stayed pending arbitration as to the moving defendants. *See RoadTechs, Inc. v. MJ Highway Tech., Ltd.*, 79 F. Supp. 2d 637, 640 (E.D. Va. 2000) ("[I]t is rather obvious that where the court has entered an injunction pending arbitration, the

---

[5] In light of this ruling, Amegy's motion for partial summary judgment against Johnson and Monarch, (Docket Entry No. 103), is denied.

district court should stay the action so that the court retains authority to enforce the injunction."). A hearing on Amegy's motion for contempt, (Docket Entry No. 86), and a status conference as to the claims against the Bobo defendants are set for **May 11, 2012 at 2:30 p.m.**

   SIGNED on April 27, 2012, at Houston, Texas.

                _____
                Lee H. Rosenthal
                United States District Judge